Submitted on briefs February 21, reversed November 27,
petition for rehearing denied December 24, 1957

## COMER *v.* WORLD INSURANCE CO.
318 P. 2d 916

Carson, Carson & Gunnar and Douglas L. Hay, Salem, for appellant.

Williams & Skopil, Salem, for respondent.

ROSSMAN, J.

This is an appeal by the defendant, World Insurance Company, from a judgment which the circuit court entered in favor of the plaintiff upon a policy of health and disability insurance which the defendant-appellant issued to the plaintiff as the insured October 14, 1949. The challenged judgment was preceded by a verdict in the plaintiff's favor. The complaint alleged that the event insured against occurred and that the defendant, after paying the plaintiff $566.66, refused to make further payments, although more became due. The challenged judgment awarded the plaintiff $1,600, an attorney fee, and costs.

The answer charged that the plaintiff induced the defendant to issue the policy by making, through the medium of the application for insurance, fraudulent representations concerning his health and medical history. In *Comer v. World Insurance Company,* 212 Or 98, 318 P2d 913, this day decided by us, we summarized the alleged false representations as set forth in the defendant's cross-complaint. In the defendant's "second defense" to the complaint filed in this action, the defendant made the same charges. It repeated them in a counterclaim in which it sought judgment against the plaintiff for $566.66, sums which it had paid to the plaintiff as disability payments before it discovered, so it claims, that the statements which the plaintiff had made in the application concerning his health were false. Since the alleged false representations are reported in *Comer v. World Insurance Company,* supra, we will not repeat them in this opinion.

The reply denied all allegations which charged that the plaintiff made fraudulent representations to the defendant. It admitted "defendant, World Insurance Company, attached said application to said insur-

ance policy and that the same is a part of Exhibit 'A' hereto." The exhibit just mentioned is a copy of the policy. The reply, referring further to the second defense, said: "Admits Paragraph III." The latter reads as follows:

"On or about 14 October 1949, defendant delivered a copy of said application to plaintiff, with, and as a part of, said policy."

Thereby the plaintiff concedes that the defendant made the application a part of the policy and delivered a copy of the conjoined instrument to him. The policy became effective October 14, 1949, at noon. As we have just seen, the plaintiff acknowledges that he received on that day a copy of the application. The importance of the admissions just noted will later become apparent. The reply to the counterclaim denied its averments, but admitted that defendant had paid to the plaintiff upon the policy "certain sums"; it did not disclose the amounts.

The application, which was short, read in part as follows:

"Do you hereby apply to the World Insurance Company of Omaha, Nebraska, for a Lifetime Disability Benefit Policy, to be issued solely and entirely in reliance upon the written answers to the following questions which you adopt as your own and represent to be true, full and complete, and do you agree and understand that this application shall not be binding upon the Company until accepted by the Company? . . . Yes.
* * *
"9. Are you sound physically and mentally to the best of your knowledge and information? . . . Yes.
"10. Have you ever had any of the following diseases: * * * Heart Disease? . . . No. High or low blood pressure? . . . No. Disease of the

brain or nervous system? . . . No. * * * Stomach or gall bladder trouble? . . . No. If so, give details.

"11. Have you received medical or surgical advice or treatment or had any local or constitutional disease within the past five years? . . . No."

The plaintiff concedes that about six months before the policy was issued he received medical treatment from two Salem physicians, that he was hospitalized for five days and that a physician, who specialized as a neurologist, gave him six electric shock treatments. While he was receiving the therapeutic treatments just mentioned he lost five months' employment.

To the extent that the answers which we quoted from the application are at variance with the facts just recounted, the plaintiff concedes their falsity. He contends, however, that he related the true facts to the defendant's agent before signing the application. He submits that the agent, and not himself, was responsible for the erroneous information which the application contains.

The defendant admits that on August 4, 1951, when all current premiums upon the policy had been fully paid, the plaintiff met with an accident whereby he became entitled to receive the monthly sums provided by the policy if its defense of fraud lacks merit. After it had paid him $546.66 in monthly installments [it had previously paid him $20 upon another claim] it contended that it discovered that the application included false answers and refused to make further payments.

The defendant-appellant presents sixteen assignments of error. We shall now consider those which are based upon the parol evidence rule and the defendant's motion for a directed verdict.

In March, 1949, about six months before the policy

was issued, abdominal discomforts which the plaintiff experienced caused him to consult Dr. Merle Brown, in Salem, one of the two physicians whom we have mentioned. Dr. Brown diagnosed the plaintiff's maladies as an intestinal fecal impaction causing an obstruction, hemorrhoids and a marked anxiety tension state. Comer was hospitalized for five days, during which the intestinal obstruction was cleared. Although the patient's physical state was thereby improved, his mental condition was not. After Comer's discharge from the hospital, Dr. Brown administered, during five office calls, treatment for anxiety, to which the patient did not satisfactorily respond. April 16, Dr. Brown referred Comer to Dr. Paul Wolfe, a neurologist. The latter is the other physician to whom we have referred. Dr. Wolfe confirmed the diagnosis of aggravated anxiety, a state of mind which, according to Dr. Wolfe, accounted for the physical ailments. The anxiety symptoms of giddiness, tiredness, muscular tension, neckache and tightness of scalp were "classically present in his case." Comer was, in Dr. Wolfe's opinion, a neurotic. In order to alleviate the neurosis, Dr. Wolfe subjected Comer to six electric shock treatments in June, 1949. His response to the treatment was favorable, but his condition did not improve sufficiently to satisfy the neurologist. After a series of home and office calls, Comer, on August 10, 1949, allowed the professional relationship with Dr. Wolfe to lapse.

A month or so after he had discontinued Dr. Wolfe's services, Comer communicated with the defendant, inquiring for information about its policies which afforded health and accident indemnity. His troubles in the preceding months had caused the loss of five months' employment, and the prospect that this might

recur was alarming. He and his wife, therefore, decided to investigate insurance protection against income loss. In response to their inquiry, one George E. Dayton, an agent of the defendant, called upon the Comers October 6, 1949. What transpired there is the subject of conflicting testimony, but it is agreed that at that conference Comer signed an application for defendant's accident and health policy. As we have seen, the plaintiff's pleadings concede that when the policy was delivered to him there was attached to it a photostatic copy of the signed application. Further, it is agreed that the questions and answers quoted in a preceding paragraph formed a part of the application.

As a result of the application, the defendant, on October 14, 1949, issued to Comer a policy which provided that the defendant insured him

> "against loss of life, limb, sight or time sustained or commencing while this policy is in force, resulting directly or independently of all other causes from accidental bodily injuries sustained during any term of this policy, hereinafter called such injury, and against loss of time beginning while this policy is in force and resulting from sickness contracted during any term of this policy, the cause of which originates more than thirty days after the effective date hereof, * * *."

The policy contained these additional provisions:

> "1. This policy includes the * * * attached papers * * * and contains the entire contract of insurance. * * *
>
> "2. No statement made by the applicant for insurance not included herein shall avoid the policy or be used in any legal proceeding hereunder. No agent has authority to change this policy or to waive any of its provisions. No change in this policy shall be valid unless approved by an executive

officer of the Company and such approval be indorsed hereon.

&ast; &ast; &ast;

"(a) This policy is issued in consideration of the statements made by the Insured in the application herefor, a copy of which is indorsed hereon and made a part hereof, * * *."

Upon the cover page of the policy was the following:

"Important. Please read the following carefully before putting your policy away: * * * This policy is a plainly worded contract, giving a definite promise of protection; * * *."

The conference, in the course of which the plaintiff signed the application, occurred in the plaintiff's home October 6, 1949. Upon that occasion, the plaintiff, his wife, Dayton [defendant's agent] and an individual by the name of Homer C. Walker were present. Walker had lived in the Comers' home over a considerable period. The application was signed at the close of the conference. The Comers and Dayton were seated beside a table while Dayton explained the policy and made the entries in the application form after the plaintiff had decided that he wished the insurance. The plaintiff acknowledged that he could see the paper which Dayton had in his hand. Walker was seated nearby where he could hear what was said and watch Dayton fill in the blank spaces of the application form.

■ As we have said, the plaintiff claims that he told Dayton the truth about his recent illness and that Dayton, unbeknown to him, entered in the application form erroneous data. He concedes that he signed the application and returned it to Dayton for delivery to the defendant. By invoking the doctrine of equitable estoppel, the plaintiff took upon himself the burden of showing that in equity and good conscience the

defendant should not be permitted to use against him the application which bears his signature and which contains answers that, he concedes, are contrary to the truth. He argues that if the record shows that he told Dayton the truth about his recent illness of five months' duration and also gave Dayton the names of the physicians who treated him, he thereby established a right to an estoppel in his favor.

The plaintiff, the latter's wife and Walker [the Comers' boarder] gave testimony in the plaintiff's favor. Dayton testified as a witness for the defendant.

When the plaintiff was asked upon direct examination whether, in the course of the conference, Dayton read to him the questions that are found in the application form, he replied that Dayton read some of them. He swore that he truthfully replied to all questions that were read and that he gave Dayton a correct account of his health and the medical treatment he had received. Upon cross-examination, he admitted that Dayton asked him all, or virtually all, of the questions which appear in the application.

We have read the testimony with care. Our purpose was not to evaluate it or retry the issues which were submitted to the jury, but to determine whether or not the plaintiff established a basis for the equitable estoppel, by virtue of which he sought to prevent the defendant from calling to its avail the application. An examination of the evidence and of the plaintiff's brief indicates that the basis upon which the plaintiff claims that he is entitled to estop the defendant from resort to the application are these contentions: (1) he told the defendant's agent the truth about his health, medical treatment and hospitalization; (2) the defendant's agent, without the plaintiff's knowledge, wrote

false answers in the application; (3) the defendant issued to the plaintiff the policy of insurance for which the plaintiff applied; and (4) the plaintiff paid the required premium. The purported facts just summarized constitute the sole basis upon which the plaintiff seeks the estoppel. He does not claim, as did the plaintiff in *Simmons v. Washington National Insurance Co.*, 136 Or 400, 299 P 294, that he could not read or write. Nor does he contend, as did the plaintiff in *Dolan v. Continental Casualty Co.*, 131 Or 327, 279 P 855, 281 P 182, 283 P 15, that he was forced to depend upon the agent to translate some of the facts which he recited and which were entered in the application "into the succinct phrasing of insurance parlance."

■ Much of the time of the trial was consumed in efforts to determine what the plaintiff told Dayton about his health and the treatment he had received from physicians and hospitals during his recent illness. The process of eliciting the information consisted of reading to him, one by one, the several questions which are included in the application and of then asking him, not only whether Dayton had read the questions to him, but also for the answer which he made to Dayton. The plaintiff's testimony as transcribed shows that, as a witness, he gave to counsel many contradictory answers; but we pass that fact by since circumstances of that kind are for the jury's consideration. However, the situations of which we will now take notice are probably of a different kind.

The opening paragraph of the application is quoted in a preceding paragraph of this opinion and consists of an inquiry to the applicant as to whether he realizes that the policy, if granted, will be "issued solely and entirely in reliance upon the written answers to the following question which you adopt as your own and

represent to be true, full and complete  \* \* \*?" Upon direct examination the following took place:

"Mr. Comer, I will ask you whether or not Mr. Dayton asked you the following questions: (Reading) 'Do you hereby apply to the World Insurance Company of Omaha, Nebraska, for a Lifetime Disability Benefit policy to be issued solely and entirely \* \* \*?'"

Thereupon the question which we just copied from the policy was put to the witness. Counsel's question concluded in this way:

"Did he ask you that question?"
The plaintiff replied:

"No, sir."

When the same question was propounded to him upon cross-examination, the plaintiff answered in the following way:

"A I could have said 'yes' and I could have said 'no.'

"Q Which did you do?

"A I don't know if—I don't know either one or the other."

Upon redirect examination, plaintiff's counsel was permitted, over the defendant's objection, to submit to the plaintiff the question once more. After the objection had been overruled, the following occurred:

"Q Did you understand the question, Mr. Comer?

"A It was not, no, ever read to me."

The plaintiff conceded that the policy was delivered to his home in October of 1949 and that he had it in his possession from that time on. At the outset the plaintiff testified that he had never read the application. Upon cross-examination the following occurred:

"Q Did you or did you not read this application for insurance?

"A I did not.

"Q Do you recall giving your deposition over in the old high school building, the temporary court-house, on October 3, 1953, at the hour of 11:10 in the morning? Do you remember that?

"A Yes, sir.

"Q I will ask you whether or not at that time and place, upon your deposition being taken under oath, you did not testify in part as follows: Page 19. (Reading) Question: 'Did Mr.—Whoever this man was that filled in those blanks, did you see him fill them in? Answer: 'Well, he kind of held it up at the table alongside me; I wasn't watching him. Question: 'But you did read it? Answer: 'Yes, sir. Question: 'And you saw him fill it in? Answer: 'Yes, sir.'

Did you so answer those questions?'"

Some colloquy then occurred, at the termination of which the witness answered, "Yes, I did." Plaintiff's counsel thereupon requested that the question be read to the plaintiff and after that request had been complied with, defendant's counsel renewed the question by asking:

"Q Now, did you or did you not so testify at that time and place before that notary public?

"A Yes, I did.

"Q Pardon?

"A I did.

"Q Now you testify you didn't read it?

"A Well, I didn't read all of it.

"Q You testified just now, I believe twice, that you did not read it.

"A I didn't read it all, just what the—I didn't read it all.

"Q Now you say you read a part of it; is that correct?

"A Yes."

Another part of the cross-examination gives us the following:

"Q The policy, which is the insurance policy in question here, you got that sometime in October of 1949, did you not?
"A Yes, sir.

"Q And you kept it from then on, did you not?
"A I believe so, yes.

"Q Never mentioned anything about any of these answers being incorrect to anybody, did you?
"A No.

"Q You saw the application—I mean a photostatic copy of the application which was attached to the policy, you saw that?
"A There was some papers attached."

The plaintiff's wife testified that she observed during the course of the visit that Dayton made notes and did some writing. She conceded that, in the equity trial which preceded the one culminating in this appeal, she gave the following testimony:

"Q Did Mr. Dayton at any time indicate to Mr. Comer he was completing the application for him; do you recall?
"A I wasn't questioning him, what he was filling out, but I understood it was something that had to be—the questions had to be turned in for the policy and I figured it was an application or something."

In addition to admitting that she so testified in the equity suit, she added, "And my testimony is the same." The following is taken from her further cross-examination:

"Q Did you examine the policy after you received it?
"A Yes, we looked it over.

"Q Including the application?
"A Yes, sir.

"Q The application which was attached to the policy?

"A It showed the application—this receipt or payment you mean?

"Q No, I mean the application for which Mr. Comer had signed, a photostatic copy of which was attached to the policy when you received it, was it not?

"A I don't recall if it was. I know it was a big thick envelope, a long envelope, and my husband got it in the mail and he sat down and read it.

"Q You didn't examine it?

"A Yes. I looked at it. Yes, I read it over.

"Q You read the policy?

"A Yes.

"Q All of it?

"A Yes. The reason why was because it was a lifetime policy and we felt it was—it sounded like a good policy to me."

Presently she qualified the statements just made by explaining that she

"looked through the policy and I read certain parts of it in case he got hurt and how much he would receive, and just, you know—we talked it over and had other people read it for me that understood.

"Q As I understand it, you and Mr. Comer, after the policy was received in the mail, sat down together and looked through the policy and discussed it back and forth; is that right?

"A That we what?

"Q Discussed the policy between you.

"A Studied it?

"Q Discussed it.

"A Oh, well, we—we just knew we had the policy.

"Q Did you talk about it?

"A We figured Mr. Dayton had explained what we got.

"Q Mrs. Comer, if you would please answer my question. Did you and Mr. Comer talk about the policy when you received it in the mail? Did you sit down and talk it over, you and your husband?

"A I don't know if I did just that very day.

"Q Or within a few days?

"A We talked it over.

"Q You say you had other people examine the policy?

"A Eventually we got out the policy and discussed it with people, yes. It was the normal thing to do. We were insured and came under insurance, why you naturally would do that."

The foregoing will have to complete our narrative of the evidence. We have given, so we believe, the version which is most favorable to the plaintiff.

■ It is manifest that the answers which appear in the application over the plaintiff's signature do not state the truth. The document itself asked the applicant if he applied for a policy "to be issued solely and entirely in reliance upon the written answers to the following questions:" The word "yes" appears after that question. When the plaintiff, as a witness, was asked what answer he gave to Dayton when the latter read to him that question, he replied: "I could have said 'yes' and I could have said 'no.'" In considering the questions and answers that follow the one to which we just adverted, we need not determine the plaintiff's good-faith understanding of such terms as "stomach trouble" or "disease of the nervous system" or "constitutional diseases" as those terms are employed in the application, for the answer found in the latter that the plaintiff had not received medical

treatment within the past five years is patently false. It was material to the risk. *Mutual Life Insurance Company of New York v. Chandler*, 120 Or 694, 252 P 559. The medical treatment which an applicant has received is material to the prospective insurer inasmuch as the applicant's physicians are best qualified to inform the insurer of the nature and gravity of the disability for which the medical men treated the applicant.

■ If the plaintiff believed that he was actually accepted by the defendant as an insured and that through mutual mistake the application was erroneously written, the remedy of reformation was available to him. *Boardman v. Insurance Company of the State of Pennsylvania*, 84 Or 60, 164 P 558, and Vance on Insurance, 3d Ed, p 260. The contention frequently advanced in reformation cases that the remedy is not available to an insured who failed to read his policy very likely would not have deterred the plaintiff, for he testified—at least at times—that he had read the policy. His testimony to that effect was supported by his wife. But he would have encountered difficulty with the proposition that reformation can be had only if the oral promise is within the agent's authority. See Notes, 47 Harv L Rev 1010. Upon that score we call attention to the provision of the policy quoted in a preceding paragraph:

"No agent has authority to change this policy * * *. No change in the policy shall be valid unless approved by an executive officer of the Company and such approval be indorsed hereon."

The plaintiff made no effort to prove that Dayton's authority included power to write the type of policy which he claimed he possessed; that is, one covering

an applicant who, in the last five years, had received medical and hospital treatment.

The plaintiff did not choose the remedy of reformation. Rather, he brought action upon the policy as written and sought to meet the defense of fraudulent representation by a procedure which has been termed "a shortcut to equitable reformation." See *Lumber Underwriters v. Rife*, 237 US 605, 35 S Ct 717, 59 L Ed 1140, and Notes, 47 Harv L Rev 1010. The plaintiff contends that (1) if he told the defendant's agent the truth about his illness; (2) if the agent made false entries in the application form without the plaintiff's knowledge; (3) if the defendant delivered the policy to the plaintiff as a valid contract of insurance; and (4) if the plaintiff paid the premiums in good faith and relied upon the policy, the defendant is estopped to resort to the truth in defending itself. The doctrine of which he seeks to avail himself is that of equitable estoppel. See *Mercer v. Germania Insurance Co.*, 88 Or 410, 171 P 412. The outstanding exponent of that doctrine, until it was discarded, if not overruled, by *Northern Assurance Co. v. Grand View Building Assn.*, 183 US 308, 22 S Ct 133, 46 L Ed 213, was *Union Mutual Insurance Co. v. Wilkinson*, 13 Wall 222, 20 L Ed 617.

■ Although estoppel is largely a creature of equity, the law courts, upon adopting it, proceeded to enforce it under the rules which govern legal remedies: Pomeroy, Equity Jurisprudence, 3d Ed, § 802.

As we have seen, the policy says:

"This policy is issued in consideration of the statements made by the Insured in the application herefor, a copy of which is indorsed hereon and made a part hereof."

ORS 736.305 reads:

"(1) Every contract of insurance shall be construed according to the terms and conditions of the policy, except where the contract is made pursuant to a written application therefor, and such written application is intended to be made a part of the insurance contract. In that case, if the company delivers a copy of such application to the assured, thereupon such application shall become a part of the insurance contract. If the application is not so delivered to the assured, it shall not be made a part of the insurance contract.

"(2) Matters stated in an application shall be deemed to be representations and not warranties."

The insurer contends that the section just quoted evokes the parol evidence rule and thereby bars Comer from denying that the representations in the application are as set forth in it. Our parol evidence rule, as stated in ORS 41.740, follows:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However, this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud."

■ Many authorities hold that the insured is barred from proving by parol that the written representations are not as he intended. Three decisions to that effect which are frequently cited are *Minsker v. John*

*Hancock Mutual Life Insurance Co.*, 254 NY 333, 173 NE 4, 81 ALR 829; *Metropolitan Life Insurance Co. v. Alterovitz*, 214 Ind 186, 14 NE2d 570, 117 ALR 770; *Gillan v. Equitable Life Assurance Society*, 143 Neb 647, 10 NW2d 693, 148 ALR 496. In each of those cases the parol evidence rule was at least an alternative, if not the primary basis of decision.

■ *Beard v. Royal Neighbors of America*, 60 Or 41, 118 P 171, appears to indicate that this court adopted a rationale similar to the decisions just cited. However, that decision does not state whether or not the application was made a part of the policy. When the decision was written, ORS 736.305 was not a part of our laws. Resort to *Beard v. Royal Neighbors of America*, 53 Or 102, 99 P 83, which was an earlier appearance of the case before this court, appears to warrant a belief that the application was actually made a part of the policy. It remains a fact, nevertheless, that the decision in 60 Oregon attached no importance to that circumstance. The objection offered to the parol evidence at the trial was couched in language which seemed to invoke the best evidence rule. By turning to the brief filed in that case by the respondent, it is seen that the latter defended the exclusion of the evidence upon the ground that the plaintiff sought by its introduction to establish an "unpleaded waiver." Those circumstances persuade us that the decision cannot be fairly cited as authority that the parol evidence rule excludes evidence such as that upon which the plaintiff was permitted to recover in this action.

*Simmons v. Washington Fidelity National Insurance Co.*, 136 Or 400, 299 P 294, ruled that parol evidence was admissible to establish that the insured had truthfully related his medical history to the agent,

although the written application denied such history. ORS 736.305 was in effect at that time. The insured in that case could neither read nor write. Unfortunately, the opinion does not disclose whether or not the application was attached to the policy. If it was, it became a part of the contract; if not, ORS 736.305 was not applicable. Thus the decision is not persuasive because it failed to recognize that distinction. The briefs in the case disclose that the insurer chose not to attempt to argue the application of the parol evidence rule with exactitude. The opinion quotes from Joyce on Insurance a section which iterates the rule that in such cases the insured may recover. The same treatise in the very next section cites a number of cases in which the parol evidence rule was held to be a bar. *Simmons v. Washington Fidelity National Insurance Co.*, 140 Or 164, 13 P2d 366, a subsequent appearance of the case before this court, accepted as the governing law the rule enunciated in the earlier appearance of the case before this court on the basis that it was the law of the case.

*Dolan v. Continental Casualty Co.*, 131 Or 327, 279 P 855, 281 P 182, 283 P 15, was based upon a policy of accident insurance issued by the defendant to the plaintiff's husband, since deceased. The application identified the insured as "telegraph operator, office duties only." The policy characterized him in the same way. The application was attached to the policy and made a part of it. Although the statute which is now identified as ORS 736.305 was in effect when the case was decided, it received no mention in the opinion. The defendant, in denying liability, contended that the deceased's duties were not performed exclusively in an office but were rendered in part in a railroad yard. The defendant classified in several

categories the work of a telegraph operator, according to the place where the service was performed and graduated the premiums according to the classification in which the insured belonged. Conformable to its contentions, the deceased would have been required to pay an annual premium of $37.80 had his occupation been correctly classified in lieu of the sum of $15.60 which the policy exacted. The plaintiff offered testimony that the deceased, in applying to the defendant's agent for the policy, truthfully described to him his duties and the places where they were performed. According to the proffered testimony, the agent advised the applicant that under the defendant's classification he was deemed "a telegraph operator, office duties only" and thereupon wrote that term in the application. The defendant's objections to the offered testimony were sustained, but the jury, nevertheless, rendered a verdict for the plaintiff. In holding that the evidence was admissible, this court leaned heavily upon *Arneberg v. Continental Casualty Co.*, 178 Wis 428, 190 NW 97, 29 ALR 93, which resolved a similar problem of classification in the insured's favor. The following was quoted from that decision:

"The rule is based on the principle that, under such circumstances, the agent is the agent of the company and not that of the insured, and that, where the insured fully and fairly states the facts, the agent who translates such facts into the succinct phrasing of insurance parlance acts as the agent of the company. * * *

"It is quite generally held that, by reason of this principle, accident insurance policies are not void because the agent who filled out the application did not properly classify the applicant's occupation."

In *Eaid v. National Casualty Co.*, 122 Or 547, 259 P 902, the plaintiff, the insured in a policy of accident

insurance issued by the defendant, alleged that he was disabled by an accident and sought indemnity under the policy. The application was attached to the policy, and our present statute, to which we have referred as ORS 736.305, was then in effect. The application described the insured as "a hotel-keeper" and stated that his income was at least 25 per cent greater than the indemnity for which he applied. The answer alleged that both statements were false and that plaintiff's occupation was that of an operator of apartment and rooming houses. The decision, which affirmed judgment for the plaintiff, mentioned only that part of ORS 736.305 which reads: "The matter stated in the application shall be deemed representations and not warranties." It treated the issues as governed by the rules pertaining to fraudulent representations and, finding that the alleged false representations were not material, held that the defendant was liable upon its policy.

*Williams v. Pacific States Fire Insurance Co.*, 120 Or 1, 251 P 258, by dictum, approved the rule of the Simmons case. However, in the Williams decision, the application for the policy [fire insurance] was not in writing, and the decision made no distinction between oral applications and those in writing which are incorporated in the policy.

In *Lindstrom v. National Life Insurance Company*, 84 Or 588, 165 P 675, the policy was issued before ORS 736.305 was enacted. The decision seemed to subscribe to a rule that if an applicant makes truthful statements as to his health to a medical examiner, who, without the knowledge of the applicant, fraudulently changes the answers so as to make it appear that the insured is a safe risk, the insured may recover.

The decision said nothing concerning the parol evidence rule and its application to cases of this kind.

We shall conclude this review of our previous decisions by taking note of the following which appears in *Cranston v. West Coast Life Insurance Co.*, 63 Or 427, 128 P 427:

> "This application * * *, was a proposal to the defendant to enter into a contract of insurance. In response to this offer the defendant issued its policy, which may be termed a counter offer, * * * *"

Thus there was applied to the situation general contract law.

We believe that none of our previous holdings has passed upon the precise issue which is now before us. It is true that some of them [the Simmons, Dolan, Williams and Lindstrom decisions] indicate that if the applicant, in answer to the questions propounded to him by the application, makes truthful answers and the agent, in disregard of them, inserts data whereby the applicant is made to appear as a safe risk, the insured is not bound by the application. However, as we have here indicated, our previous decisions lack precision and did not examine the application of ORS 736.305 nor the effect of attaching to the policy a copy of the application.

In Notes and Comment, 16 Corn L Q 235, the writer analyzed *Minsker v. Hancock Mutual Life Insurance Co.*, supra, which was based in large part upon a New York statute that was the forerunner of ORS 736.305. The treatise says:

> "One of the avowed purposes of the statute was to give the insured an opportunity to read the application, or a copy, and to correct any mistakes he himself had made. This objective of the statute

worked in his favor, of course. * * * The court thought that the applicant's protection was not the only purpose of the statute. They reasoned that since the legislature put in his hands the means of ascertaining the contract, it also intended to place upon him the duty of reading it and objecting to any false statements therein. It thus applied general contract law."

From Appleman, Insurance Law and Practice, § 9405, we take the following:

"Where an application is attached to a policy and the policy is accepted and retained by the insured, the general rule is that he is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein, so that he is estopped to claim that he did not make such statements, or that he gave true information and that such answers were those of the insurer's agent, * * * ."

To attempt herein to analyze, one by one, the numerous decisions which resolved problems similar to the one at bar would greatly prolong this opinion. The following is a fair summary of many of those which have engaged our attention. We adopt it as our own.

"In recent years a large and increasing number of courts have, under varying circumstances, refused to admit parol evidence in insurance cases in support of an equitable estoppel. In a few cases the parol evidence rule has been referred to, but the real basis for the decisions appears to be that, in the opinion of these courts, under the circumstances the conduct of the insured was not such as to entitle him or his beneficiary to equitable relief.

"Many of these cases involve statutes requiring the policy to contain the entire contract between the parties, and a copy of the false statement which the insured or beneficiary disavows is found in

the copy of the application attached to the policy. Also involved in some cases is the limitation on the authority of the agent contained in the application for the policy. Under such circumstances a large and increasing number of courts say that the insured owes a duty to the insurer to read his policy; and not having performed this duty, the insured or beneficiary is not in a position to claim the benefit of an equitable estoppel. Many of these cases involve life insurance policies, and the courts have commented on the fact that through the device of equitable estoppel the insured or beneficiary is attempting to procure insurance which no insurer aware of the facts would issue. In many of these cases it appears that the insured made no false or misleading statement but that his only fault was that he failed to read his policy and to discover the false statement which the agent had placed in the application over the insured's signature."

Vance on Insurance, 3d Ed, p 524.

■ A copy of the application for insurance was delivered to the plaintiff as a component of the policy. The latter, by express language, made the application a part of the contract of insurance, and ORS 736.305 wrought the same effect. The copy of the application which was attached to the policy was a photostatic reproduction and therefore was black in color. Its color was in sharp contrast to that of the white paper upon which the policy was written and, accordingly, was bound to attract attention. In the margin of the policy, opposite the place where the copy of the application was fastened, there appeared these words in heavy print: "A copy of the application upon which this policy is issued is attached hereto." At that point an arrow pointed to the application. The fact that the plaintiff's signature appeared at the end of the application and that many of the latter's entries, un-

like those of the policy, were in handwriting were additional circumstances that were likely to attract his attention to the application when the policy was delivered to him. We have mentioned the fact that the plaintiff conceded that he read at least parts of the application. The policy called the plaintiff's attention to the fact that the soliciting agent had no authority to change its terms. As we have seen, the ultimate effect of ORS 736.305 was to render it the plaintiff's duty to read his policy. It is clear that the Comers realized the wisdom, if not the duty, of familiarizing themselves with the terms of the policy, for they proceeded promptly to peruse it and even called to their avail a friend who had had greater experience than they with insurance policies. Had they discovered in the application any answer which the plaintiff had not made, it was their duty to have called it to the defendant's attention.

Without resort to further analysis, we express our belief that we must charge the plaintiff with knowledge of the contents of the application. ORS 736.305 demands that conclusion.

The review set forth in preceding paragraphs of the evidence showing what took place when the application was signed and the policy was delivered must not be construed as an indication that an insurer, in order to defeat recovery upon the policy, must prove that the insured, like Comer, read the policy. It will be recalled that in *Simmons v. Washington Fidelity National Insurance Co.*, supra, the insured could neither read nor write, yet he was permitted to recover although ORS 736.305 was in effect. That circumstance convinced this court that he was entitled to invoke the doctrine of equitable estoppel. In *Dolan v. Continental Casualty Co.*, supra, the beneficiary was permitted to

recover although ORS 736.305 had been enacted before the application was signed. In that case, the applicant was forced to rely upon the agent's choice of the term which designated his employment. A reading of the application would not have revealed any falsity. In *Williams v. Pacific States Fire Insurance Co.*, supra, the rule of the Simmons case was re-echoed. *Lindstrom v. National Life Insurance Co.*, supra, is an example of the equitable estoppel rule as it existed before ORS 736.305 was enacted. We mention those cases for the purpose of showing that this court has recognized that, under exceptional circumstances, a party may avail himself of the equitable estoppel doctrine even though he possesses the policy and a copy of the application with its untrue entries.

Accordingly, we go no further than to state that if an insurer complies with ORS 736.305, the applicant becomes charged with knowledge of the contents of the policy and its attached application. It then generally becomes his duty to speak up if the application contains false answers. If he remains silent, he becomes estopped to claim that the application contains answers for which he is not responsible, or, stated otherwise, he adopts the answers as his own. In this case, therefore, the plaintiff was charged with knowledge of the contents of the application and of the policy. Our analysis of the evidence, which is set forth in part in preceding paragraphs, was made solely for the purpose of determining whether the evidence established any basis for the equitable estoppel which the plaintiff sought to invoke. It disclosed none. To the contrary, it showed that the policy was obtained by false representations and that the defendant's motion for a directed verdict should have been sustained.

The complaint alleged that the defendant "has caused to be paid unto plaintiff the sum of $566.66." Thereby the plaintiff conceded the receipt of that amount of money from the defendant. The counterclaim averred that the defendant had paid to the plaintiff $566.66 in benefits and that the plaintiff had paid to the defendant $165.25 in premiums. Demand was made for judgment in the amount of $401.41. The reply to the counterclaim was couched in this form:

"In reply and answer to the counterclaim of defendant, Earl Comer denies each and every allegation contained therein except that there were certain sums paid to the plaintiff by the defendant on account of said policy."

The deposition of Ruth Kuran, assistant secretary and chief underwriter of the insurer's accident and health department, showed that $566.66 had been paid to the plaintiff. The amount of the premiums paid by the plaintiff to the defendant can be computed from the record with mathematical certainty. It is our belief that the motion for a directed verdict should have been sustained and that error was committed when it was overruled.

The judgment of the circuit court is reversed. The cause is remanded for it to enter judgment in accordance with the above.

KESTER, J., specially concurring.

I concur in the result, but I cannot agree with the reasoning by which the majority arrive at that result. In my opinion the result could be justified on either of two grounds:

(1) Plaintiff did not plead, either in the complaint or in the reply, any fraud or mistake on the part of defendant's agent in making out the application, nor

any facts to show that defendant waived or is estopped to rely on the falsity of the answers. When the case was on the equity side, plaintiff pleaded estoppel in his reply; but when the case was tried on the law side plaintiff withdrew the former reply and went to trial on a reply which was merely a general denial. Assuming that a plea of estoppel in the reply would have been sufficient, and not a departure from the complaint (compare *Mercer v. Germania Ins. Co.*, 88 Or 410, 415, 171 P 412, with *Walker v. Fireman's Fund Ins. Co.*, 114 Or 545, 570-71, 234 P 542), it is still necessary that the estoppel be pleaded somewhere. *Walker v. Fireman's Fund Ins. Co.*, supra, 114 Or at 573. Defendant made timely objection to plaintiff's testimony in rebuttal, on the ground that estoppel was not pleaded; so the plaintiff's failure to plead estoppel cannot be aided by the verdict, even if the omission were otherwise curable.

(2) The testimony of plaintiff himself might well be treated as a judicial admission that he did give at least one false answer to the agent. As pointed out by the majority, plaintiff's testimony was confusing and self-contradictory in many respects. However, it appears that at one point (when reference was made on cross-examination to his deposition prior to trial) he rather definitely said that he had answered "no" to the agent's question as to whether he had seen a doctor within the past five years. The testimony was as follows:

> "Q I am not asking you about what you say happened, but I am asking you if you testified in your deposition that the reason you believed you might have answered no, in referring to that,— seeing a doctor within or receiving medical or surgical advice or treatment, or had had local or constitutional disease in the past five years,—the

reason you believe you might have answered no was because you didn't place any responsibility or importance on it; isn't that right?

"A Yes.

"Q So then you did answer him no to that question, didn't you?

"A Yes."

If this be treated as a considered statement, and not a matter of confusion or uncertain memory, he should be bound by it, notwithstanding other evidence produced by him to the contrary. *Morey v. Redifer,* 204 Or 194, 214, 264 P2d 418, 282 P2d 1062; Anno. 169 ALR 798.

Notwithstanding the foregoing grounds which are available to support the result, the majority prefer to rest their decision upon a construction of ORS 736.305. Since I cannot agree with that construction, and the decision seems to depart from prior Oregon cases, without expressly overruling them, I feel compelled to record my reasons. In doing so it will be assumed, as in the majority opinion, that the issue of estoppel was properly raised by plaintiff.

It will also be assumed, as in the majority opinion, that the evidence made a jury question as to whether plaintiff gave deliberately false answers to defendant's agent, or whether he answered truthfully and defendant's agent inserted the false answers without plaintiff's knowledge. The jury having resolved that question in favor of the plaintiff, we must begin with the factual premise that plaintiff made a full and true disclosure, and that defendant's agent was guilty of fraud or mistake in filling in the application.

The question then is whether an insured, who is in fact free from fraud, is nevertheless to be barred from recovery as a matter of law because the applica-

tion which he signed contained false answers, which were inserted by defendant's agent without plaintiff's knowledge.

The majority states plaintiff's contention to be that "defendant is estopped to resort to the truth in defending itself." In view of the jury verdict I think plaintiff's position, more accurately stated, is that defendant is estopped to rely on the written application, when that application did not state the truth because of the wrong of defendant's own agent.

The policy considerations inherent in this problem have puzzled the courts for many years. Speaking broadly, there is on the one hand the rule upholding written instruments as against parol testimony, and on the other the rule against permitting one to take advantage of his own wrong. When these two principles have come into conflict in this type situation, the majority of courts have given greater weight to the latter. The editors of ALR state the general rule as follows:

"Apart from any question of the effect of any attempt on the part of an insurer to limit the authority of its agent by stipulations inserted in the application or policy, or provisions in its by-laws, or by statute, it may be asserted that the rule supported by the great weight of authority is that if an application for insurance is drawn by an agent of the insurer, who fills in false answers to the interrogations contained therein, which are truthfully answered by the insured, without fraud, collusion, or actual knowledge of the insured or the existence of circumstances from which constructive knowledge of such falsity might be imputed to him, the insurer cannot rely upon the falsity of such answers in seeking to avoid liability under the policy issued upon the application. The view generally taken is that the agent, in making out the

application acts for the insurer, and the insurer is therefore estopped to assert the mistake; or, as has been said in some cases, the mistake is deemed to be waived by the insurer." Annotations 81 ALR 833, 835-36; 117 ALR 790; 148 ALR 507, 508. See also Vance on Insurance (3d ed) p 523-24; 45 CJS 735, Insurance § 729.

In 1 Joyce on Insurance 632, § 505, quoted with approval in *Simmons v. Washington Fid. Nat. Ins. Co.*, 136 Or 400, 406, 299 P 294, it is stated:

"It may be considered as a well-settled rule that parol evidence is admissible to show that the agent of the company at the time, when acting within the apparent scope of his authority in filling out the application, has been truly and fully informed by the applicant of the facts, or that he had actual knowledge thereof, and that he had nevertheless, without the authority, consent, or knowledge of the applicant misstated the facts in the application, or that he had omitted to insert certain facts therein. Such evidence is not admitted to vary or contradict the writing, but is based upon the principle that the writing was procured under such circumstances that it can not lawfully be used against the party whose name is signed to it. It is not his instrument, so far as the claimed erroneous statements are concerned. * * * The writing in such case is not the applicant's statement, although signed by him, and the insurance company is estopped to claim that the representation is that of the insured. The error is chargeable to the insurer and not to the insured."

Notwithstanding the distinctions suggested in the majority opinion, the prior decisions of this court have been rather definitely aligned with the general rule. *Lindstrom v. National Life Ins. Co.*, 84 Or 588, 592, 165 P 675; *Williams v. Pacific States Fire Ins. Co.*, 120 Or 1, 12-13, 251 P 258; *Dolan v. Continental*

*Cas. Co.*, 131 Or 327, 344, 279 P 855, 281 P 182, 283 P 15; *Simmons v. Washington Fid. Nat. Ins. Co.*, 136 Or 400, 406, 299 P 294, 140 Or 164, 13 P2d 366.

Our statutory parol evidence rule, by its terms, does not exclude evidence to show fraud or mistake, where the issue is properly raised (ORS 41.740). And in any event such evidence is admissible in refutation of defendant's claim that the answers were knowingly false. It seems self-evident that a statement in the application cannot be knowingly false if the insured at the time the application is signed, does not know what answer has been inserted by the agent.

The present majority opinion does not hold outright that parol evidence is not admissible to show what actually transpired when the application was taken. Nor does it reject completely the rule that the insurer is estopped to rely on the wrong of its own agent. But because the insured failed to speak up and advise the company of the erroneous answers after he received the policy with a copy of the application attached, the majority erect a sort of "counterestoppel" against him. That is, the insured's silence estops him from asserting an estoppel based on the active wrong of the company.

This conclusion is predicated on the "entire contract" statute, which provides:

> "(1) Every contract of insurance shall be construed according to the terms and conditions of the policy, except where the contract is made pursuant to a written application therefor, and such written application is intended to be made a part of the insurance contract. In that case, if the company delivers a copy of such application to the assured, thereupon such application shall become a part of the insurance contract. If the application is not so delivered to the assured, it shall not be made a part of the insurance contract.

"(2) Matters stated in an application shall be deemed to be representations and not warranties." (ORS 736.305.)

In my opinion the foregoing statute does not lead to such a result. The difference between a warranty and a representation, in insurance matters, is well settled. A warranty must be strictly true, regardless of intent or materiality; whereas a representation, in order to afford the insurer a defense, must not only be false and material, but it must be knowingly false— i.e., made with intent to deceive. *Mutual Life v. Chandler*, 120 Or 694, 697, 252 P 559; *Eaid v. National Cas. Co.*, 122 Or 547, 555, 259 P 902; *Mutual Life v. Muckler*, 143 Or 327, 331, 21 P2d 804.

If paragraph (1) of ORS 736.305 is construed, as in the majority opinion, to make the statements in the application irrefutable by the insured after delivery of the policy, the effect is to make them warranties, despite paragraph (2) of the same section which says that they shall be only representations. No violence would be done to paragraph (1) by holding that, notwithstanding the integration of application and policy, the insurer may be estopped to rely on its agent's wrong.

In *Mercer v. Germania Ins. Co.*, supra, in speaking of the statutory form of fire insurance policy, this court said:

"It was not the intention of the legislature when it enacted the statute defining the form of an insurance policy to relieve insurance companies from those estoppels *in pais* which are essential to fair dealing in the business world. Notwithstanding this legislation an insurer may still estop itself from relying on one or more of the defenses reserved to it in the standard policy: * * *." (88 Or at 413.)

In the Eaid case, supra, the insurer sought to avoid the policy on the ground, among others, that the application misrepresented the insured's occupation; and the insured contended that he had correctly advised the agent, and that the error was that of the agent in making out the application. The statute required standard provisions in a health and accident policy as follows (§ 6459, Oregon Laws 1920):

"(a) Contract of Insurance. A provision that such policy, with a copy of the application therefor, if any, and of such other papers as may be attached to or indorsed thereon shall constitute the entire contract of insurance except as the same may be affected by any table of rates or classifications of risks filed by the corporation with the insurance commissioner;

"(b) Statement not Incorporated in Policy. A provision that no statement made by the applicant for insurance, which statement is not incorporated in or indorsed on the policy issued to such applicant, shall avoid the policy or be used in evidence, * * *."

The policy contained the following provision:

"No statement made by the applicant for insurance not included herein shall avoid the policy or be used in any legal proceedings hereunder. No agent has authority to change this policy or to waive any of its provisions. No change in this policy shall be valid unless approved by an executive officer of the company and such approval be endorsed hereon."

Defendant contended—much as the majority opinion now holds—that because of the quoted statutory and policy provisions the insured was prevented from showing the conversations at the time the application was signed. This court rejected that contention and

held that notwithstanding those provisions the evidence was admissible to show the insured's good faith and that he had no intent to deceive. (In the Eaid case plaintiff pleaded estoppel both in the complaint and in the reply.)

The majority seek to distinguish the Dolan case, supra, on the ground that it involved merely a question of classification by the company, and that a reading of the application would not have revealed any falsity. But surely the statement that the insured's work was "office duties only" was a statement of fact within the insured's own knowledge, and the falsity would have been as apparent on the face of the application as the answers in the present case.

In the Dolan case the policy by its express terms incorporated the attached application. So far as the effect of the parol evidence rule is concerned, it can make no difference whether the application is integrated with the policy by express language or by the terms of the statute. Hence the fact that the court did not discuss the effect of § 6351, Oregon Laws 1920 (the predecessor of ORS 736.305) is of little significance. In my opinion the present decision is irreconcilable with the Dolan case.

It also departs from the doctrine, previously announced by this court, that an insured is not legally bound to read his policy after it has been delivered. In *Williams v. Pacific States Fire Ins. Co.*, supra, the court said:

"* * *. The law does not impose an absolute duty upon the applicant to read his policy when he receives it, in anticipation of a fraud or mistake on the part of the agent: Kister v. Lebanon Mut. Ins. Co., 128 Pa. 553 (18 Atl. 447, 15 Am. St. Rep. 696, 5 L.R.A. 646). 'The mere failure of the insured to inform himself of the insertion of false

answers in the application which has been filled out by the agent of the insurer, does not convict him of a lack of good faith.' 3 Cooley's Briefs on Insurance, p. 2572."

It is apparent that ORS 736.305, which appears in the general insurance code, was intended to serve essentially the same purpose as the standard provisions requirement of Oregon Laws, § 6459, which was discussed in the Eaid case. At the time the policy in this case was issued, the standard provisions for health and accident policies were set forth in § 101-803, OCLA, which in these respects was identical with Oregon Laws, § 6459. The standard provisions law was enacted in 1911, and the predecessor of ORS 736.305 was enacted in 1917. Although they were both in effect when several of the prior Oregon cases were decided, the present construction has never before been adopted in this state.[1]

The purpose of these statutes was not to benefit the insurer by abolishing the rule that it is estopped to rely on the wrong of its own agent. On the contrary, the statutes restricted the insurer's defenses by: (1) excluding entirely any evidence of the insured's statements unless contained in a written application, a copy of which is attached to the policy; and (2) making all statements in the application representations and not warranties—in other words, requiring proof of fraud in order to afford a defense.

The majority opinion holds, in effect, that the insured's retention of the policy, with the incorrect application attached, amounts to "legal fraud," notwithstanding that he was not guilty of fraud in fact.

---

[1] In Morford v. Calif.-West. States Life Co., 166 Or 575, 582, 113 P2d 629, the "entire-contract" portion of the standard life insurance provisions (§ 101-506, OCLA, now ORS 739.320) was held to exclude parol evidence of conversations between the insured and the local agent; but there was no claim that the application did not correctly reflect the insured's answers.

To my mind such a construction is not only unwarranted by the statute, but it tends to emasculate the statute by eliminating the requirement that actual fraud be proved.

It must be remembered that the insured is charged with fraud in making the application; but the facts from which the majority find such fraud as a matter of law all occurred after the policy had been delivered and was in effect. Similarly, the majority apparently attach some importance to the limitation on the agent's authority, which appeared in the policy but not in the application. How can such a limitation be binding on the insured, or have any effect on the taking of the application, when the insured has no way of knowing of it until the policy has been delivered and is already in effect?

Because the insured has signed the application, he should have the burden of proving (and pleading) that the statements in it are not his own but are those of the insurer's agent. But having proved that, to the satisfaction of the trier of fact, fraud in the inducement of the contract should not be imputed to him solely because he fails to observe the error and speak up after the contract is in effect.

Justices WARNER and MCALLISTER concur in this opinion.