Argued December 8, 1969, reversed and remanded December 16, 1970, petition for rehearing denied January 26, 1971

## BUNN, *Appellant, v.* MONARCH LIFE INSURANCE COMPANY, *Respondent.*

478 P2d 363

*Paul D. Schultz*, Oregon City, argued the cause for appellant. With him on the brief were Hibbard, Jacobs, Caldwell & Canning, Oregon City.

*Sidney A. Brockley*, Oregon City, argued the cause for respondent. With him on the brief were James O. Goodwin and Jack, Goodwin & Anicker, Oregon City.

Before PERRY,[*] C. J., and McALLISTER, SLOAN,[**] O'CONNELL, DENECKE and HOLMAN, Justices.

O'CONNELL, C. J.

Plaintiff brought this action to recover on a life insurance policy issued on the life of her deceased husband, Donald Bunn. The case was tried without a jury. Plaintiff appeals from a judgment for defendant insurance company.

Defendant denied liability under the policy on the ground that the insured made material misrepresentations in his application for the policy.

In 1965, Donald Bunn purchased a life insurance policy from defendant. The purchase was made through Lester Lewis, defendant's local agent. At the time Bunn made his first application for insurance he also signed three other application forms which were left blank except for the signature. Later when Bunn sought additional insurance Lewis filled in the previously signed blank forms by using the information contained in the first application. The application for the policy in question in the present case was completed in this way.

In this application the box entitled "marital

---

[*] Perry, C. J., retired June 1, 1970.
[**] Sloan, J., resigned September 30, 1970.

status" was filled in with the word "married," and the question, "Does any such person contemplate a change in occupation or residence, or foreign travel?" was answered "No."

At the time this application was made Bunn was not married, although he was living with plaintiff and had been living with plaintiff as man and wife for fifteen years during which time they had two children.

The evidence shows that at the time Bunn authorized Lewis to submit the application for further insurance, Bunn informed Lewis of his tentative plans to work in Vietnam. However, the new application, having been filled out upon the basis of the original application, indicated that Bunn did not contemplate any foreign travel. While the application was still being processed Bunn informed Lewis that he had definitely decided to go to Vietnam and that he wanted the policy to cover him under those circumstances. Lewis made no changes in the application. The policy was issued with the unchanged application attached and was delivered to Bunn. Shortly thereafter Bunn married the plaintiff, and left for Vietnam. He died there one year later.

The insurer defended on the basis of the two misrepresentations in the application. The plaintiff contends that the misrepresentation of marital status was not material, and that the insurer is estopped from interposing as a defense the alleged misrepresentation regarding Bunn's contemplated foreign travel, because Bunn had informed defendant's agent of the intention to travel to Vietnam. The trial court held that the misrepresentations were false and material.

Plaintiff first contends that there was no substantial evidence to support the finding that the misrepresentation of marital status was material.

The courts are not in agreement in formulating the test or standards for the materiality of false representations made in an application for an insurance policy. It may be broadly stated that a false answer is material if the insurer would not have accepted the application had a truthful answer been given.[1] The burden of proving the materiality and falseness of the answer rests upon the insurer.[2]

In the present case the insured's representation as to his marital status was concededly false—insured was not married. His false answer would be material only if the insurer would not have accepted insured's application and would not have issued the policy if the insured had truthfully stated that he was single. The insurer introduced no evidence revealing what it would have done if the insured had inserted in the application the word "single" instead of the word "married."

An officer of the insurer testified that "If we had known there was a misrepresentation, we would not have issued the policy," but he explained that this was "because we would have been very cautious and wondered whether there was other information that was misrepresentative of the truth."

This response did not reveal whether the insurer would or would not have accepted the application if the insured had inserted the word "single";

---

[1] For a discussion of the various tests for materiality, see Patterson, Essentials of Insurance Law § 82, p. 408, et seq (2d ed 1957).

[2] Vance on Insurance, p. 408 (3d ed Anderson 1951).

the response merely revealed that the insurer would not have accepted the application if it knew that the insured was lying in one particular because there would then be a basis for distrusting the insured's representations as to other particulars. The witness went on to testify, as follows:

"Q  And as an Underwriter, what has marital status to do with life insurance risks, mortality, expectancy and so on?

"A  Well, there are several factors involved. The first is that persistency may not be as favorable as on a married person, he might not continue his premiums. There may be other parties involved, and therefore, we think that the mortality rating might be higher; on the married person, it seems to be more stable, and he also seems to be more cautious in his attitude and his way of living.

"Q  Are you talking about this from the standpoint of a chance a person takes with accidents or the chance he takes with homicide?

"A  It could be chances with homicide or any sort of violence at all, plus the moral risk.

"Q  What do you mean by 'the moral risk'?

"A  If the person is married, we feel that he is a more stable person and that he is more settled than one who is not.

"Q  Are these pretty general observations and evaluations in the life insurance industry in this part of the twentieth century?

"A  They are.

"Q  Now, would you, for a single man, be giving any insurance for a spouse carrying life insurance, on spouse or illegitimate children?

"A  No, we would not."

We do not regard this testimony as an assertion that defendant would have rejected the applica-

tion for insurance if the applicant had inserted the word "single" instead of the word "married." We interpret the testimony to mean only that if the insurer knew that the insured was single and also that he was illicitly living with a woman, the insurer would not have issued the policy or would have issued it only at a higher premium.

■ We hold that the evidence was not sufficient to establish the materiality of the insured's representation that he was married.

The representation relating to the insured's intention to travel to a foreign country was clearly material; the only question is whether the insured is bound by it.

It is plaintiff's position that Bunn informed the insurer, through its agent Lewis, of Bunn's intention to travel to a foreign country and that, therefore, there was no misrepresentation by the insured. The application when first made contained a truthful representation as to the insured's intention with respect to foreign travel. Plaintiff argues that when Bunn later informed insurer's agent of his change in plans, he did all that was necessary to supplement the information in the application.

Defendant responds to this contention by pointing to our previous cases holding that under ORS 736.305 (1) the insured has the duty to inspect the application when it is returned to him with the policy and to inform the insurer of any misrepresentations which are contained it it.[9] This duty arises irrespec-

---

[9] ORS 736.305 reads:

"(1) Every contract of insurance shall be construed according to the terms and conditions of the policy, except where the contract is made pursuant to a written application

(Continued on page 415)

tive of the misconduct of the insurer's agent in transmitting to the insurer false information.

In support of this contention defendant relies upon *Comer v. World Insurance Co.*, 212 Or 105, 318 P2d 916 (1957); *Reserve Life Insurance Co. v. Howell*, 225 Or 71, 357 P2d 400 (1960); and *Martin v. Ore. Insurance Co.*, 232 Or 197, 375 P2d 75 (1962).

*Comer, Reserve Life Insurance* and *Martin* are based on the theory that in enacting ORS 736.305 (1), it was the intention of the legislature to impose upon the insured the duty to read the application and policy when they were returned to him and to report to the insurer any materially false representation contained in the application. We have been unable to find anything in the legislative history of ORS 736.305 (1) indicating a legislative purpose to impose such a duty upon the applicant.[3]

---

(Continued from page 414)

therefor, and such written application is intended to be made a part of the insurance contract. In that case, if the company delivers a copy of such application to the assured, thereupon such application shall become a part of the insurance contract. If the application is not so delivered to the assured, it shall not be made a part of the insurance contract.

"(2) Matters stated in an application shall be deemed to be representations and not warranties."

In 1967 the legislature substantially rewrote Oregon's insurance law. ORS 736.305 (1) was partially restated in ORS 743.045. In addition, the legislature enacted ORS 743.042 (1), which reads:

"(1) All statements and descriptions in any application for an insurance policy by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy unless either:

"(a) Fraudulent; or

"(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer."

[4] Nor does there appear to be any evidence of such a legislative intent in the enactment of similar "entire-contract statutes"

Even though the derivation of the rule adopted in *Comer* cannot be traced to the statute, it is possible, of course, to explain the rule on other grounds.

On the basis of the purely traditional principles of contract law it could be said that the insured has the duty to read the policy, including the application which is made a part of it. The failure to perform this duty and to notify the insurer of the misrepresentation which would be disclosed by reading the instruments gives rise to an estoppel against the insured.

It is unrealistic to assume that those purchasing life insurance would, upon receipt of the policy with the application attached, scrutinize the answers to the questions in the application to see if the answers comported with the information given to the insurer's agent. If, then, the insured in failing to read the application acts as reasonable men ordinarily do, no estoppel should arise against him.

The estoppel should run the other way. The false answer is made by the insurer's agent and on the basis of the well-established principle of agency, the insurer should be bound by the acts of its agent. In fact, this is the mandate of ORS 744.165, which provides that "[a]ny person who solicits and procures an application for life insurance shall in all

---

in other states. Quite to the contrary, it has been suggested that this type of statute was designed to protect the insured rather than the insurer. Thus it has been said that "[t]he entire–contract statutes bear evidence of having been originally enacted to protect the insured against a particular form of abuse, the incorporation into the policy of terms, such as the bylaws of a mutual insurer, merely referred to and hence actually inaccessible to the insured." Patterson, Essentials of Insurance Law § 86, p. 441 (2d ed 1957).

matters relating to such application for insurance and the policy issued in consequence thereof be regarded as the agent of the insurer issuing the policy and not the agent of the insured."

In assessing the respective duties of the insured and the insurer it must be borne in mind that the parties to an insurance contract do not ordinarily engage in a bargaining process in which the parties give and take as they formulate their contract. The contract is one of adhesion, affording the insured little or no opportunity to bargain.[5]

Many courts, recognizing this special characteristic of the insurance contract and the tendency of the average person to accept his policy and the accompanying copy of the application without reading them, have held that the insured is not bound by the false representations made in the application by the insurer's agent.[6]

---

[5] This characteristic of the insurance contract is well described by the Kentucky court in Pennsylvania Life Insurance Co. v. McReynolds, 440 SW2d 275, 278 (Ky 1969):

"The development of our case law in this field is attributable, in part at least, to the nature of the insurance business and to the nature of the insurance contract itself which is not truly a contract of bargaining, but of adhesion; that is, the insured purchases the contract, prepared solely by the insurer, which the insured seldom reads, but just assumes is what he ordered. The insured buys protection about like he would any other commodity. The terms of the contract are fixed by the insurer, and the bargaining which precedes the execution of the contract usually goes no further than whether the applicant will take it or leave it. The prevailing business custom is for the insured to rely upon the accuracy, skill and good faith of the person who acts for the insurer in filling out the application, delivering the policy, and collecting the premium, and as a consequence the insured seldom reads his policy. For the courts to say that the insured is presumed to know the contents of the application and the policy is to set up a presumption simply contrary to fact. Vance on Insurance, 3rd Ed. (Hornbook) pages 257-259."

[6] See cases cited Anno., 26 ALR3d 6, 33-45 (1969).

It has been pointed out that the adoption of this rule opens up the opportunity for the insured or the beneficiary under the policy to falsely assert that although the applicant responded truthfully to the inquiries put to him by the insurer's agent, the latter made the misrepresentations in the application submitted to the insurer. As pointed out in Patterson, Essentials of Insurance Law, p 514-515 (1957): "Often it is the widow's word against the agent's or physician's, and the issue of credibility is for the jury. On this issue the verdict is seldom in doubt. Sentimentality increases the burdens of other policyholders."

On the other hand, the chances of chicanery on the part of the insurer's agent are also present. The agent is interested in having the application accepted by his principal and therefore is open to the temptation to insert a false answer.[7] On balance Patterson concludes that the rule permitting the insured to assert an estoppel against the insurer is preferable, reasoning that "[i]f the courts which deny the defense of misrepresentation will be alert to limit the majority rule by the collusion rule [precluding re-

---

[7] "[A]gents are usually paid for 'producing' premiums, and medical examiners are often notoriously underpaid. No agent wants to send in an application that will be rejected. The safest way to avoid rejection is to have all questions answered the way the home office (supposedly) wants them answered—by a straight 'Yes' or 'No.' Hence the applicant who begins to recount his ailments is likely to be told that he needn't worry. The author's frequent experience confirms the common belief that it is hard to get an agent or examiner to write in exceptions or qualifications to answers; especially is this true where the space is small and he will have to turn over to use additional sheets, which may cause inconvenience in using photostats of the application. The honest individual may be the victim of a mechanical, mass-production process." Patterson, Essentials of Insurance Law, p. 515 (2d ed 1957).

covery on the policy where the applicant colludes with the insurer's agent in making the misrepresentation], they will protect the insurer from palpably uninsurable risks and will probably not often allow recovery to a dishonest applicant." Patterson, *supra* at p. 515.

The Kentucky Supreme Court, in *Pennsylvania Life Insurance Co. v. McReynolds, supra* note 5, similarly balanced the interests in favor of the insured, and in doing so overruled its previous cases which had applied the same rule as we adopted in *Comer*. The Kentucky court said:

> "The ever-increasing variety of insurance offered the public in recent decades by an ever-increasing number of carriers has accentuated the problem of balancing the protection of the carriers from misrepresentations vital to the risks with the need of protecting the honest citizen from the evil incidents of sales methods which intrinsically emphasize commissions for the soliciting agent at the expense of the welfare of the interested applicant. * * *
>
> "In order to effect a better balance between the interests and responsibilities of the carrier and the applicant in the field of nonmedical health and accident insurance, we no longer will place the full responsibility on the applicant as stated in [previous Kentucky case] to see that the application is correctly filled out except where the applicant, or his agent, inserts the answers on the application form signed by or for him. * * *" 440 SW2d at 279.

■ Three members of the court in *Comer* dissented from the view adopted by the majority imposing upon the applicant the duty to read the application and notify the insurer of any misrepresentations contained in it. We now believe that the view expressed by the minority in *Comer* should be

adopted as the law in Oregon. We therefore overrule *Comer v. World Insurance Co.*, 212 Or 105, 318 P2d 916 (1957); *Reserve Life Insurance Co. v. Howell,* 225 Or 71, 357 P2d 400 (1960), and *Martin v. Ore. Insurance Co.*, 232 Or 197, 375 P2d 75 (1962).

The trial court made its decision in this case on the assumption that *Comer v. World Insurance Co.*, supra, was still viable, in which case it would bar plaintiff's recovery. Since the issue of defendant's estoppel does not appear to have been resolved by the trial court, the judgment must be reversed and the cause remanded for a new trial.

Reversed and remanded.