[No. 35895. Department One. May 31, 1962.]

MARIETA HEIN, *Respondent*, v. FAMILY LIFE INSURANCE
COMPANY, *Appellant*.*

*Ryan, Askren, Carlson, Bush & Swanson* and *Daniel C.
Blom,* for appellant.

*Paul A. Bitar* and *John H. Kirkwood,* for respondent.

HILL, J.—On its face, this case comes to us as an action
upon a life insurance policy by the widow as the bene-
ficiary.[1] The policy had been issued without a medical

*Reported in 376 P. (2d) 152.

[1] Actually she was the secondary beneficiary to whom the primary
beneficiary, the First Federal Savings & Loan Association of Hoquiam,
had assigned its rights. We shall hereafter pay some attention to this
circumstance, but it is not material to our present consideration.

examination on the basis of representations made in the application signed by the insured. The application was made May 20, 1959 (and policy was issued as of that date), and death occurred February 3, 1960, of a myocardial infarction resulting from coronary insufficiency and arteriosclerotic heart disease. Investigation disclosed several false answers in the application. The insurance company refused payment and tendered back the initial premium of $72. This was refused and this action was commenced.

The defense was that the applicant's representations, in the following material particulars as contained in the answers on his application for insurance, were either false or misleading:

A. The answer was "no" to the question as to whether he had ever had any electrocardiograms. The facts were that he had had many electrocardiograms dating back to May 7, 1957.

B. The answer was that he had never had, or never been told, that he had heart disease, chest pain, high blood pressure. In fact, he had had periodic chest pains, dating back to 1957 when he had been hospitalized; he had been told by his doctor that he had high blood pressure and that he was suffering from an inadequate supply of blood to the heart.

C. The answer to the question about physicians consulted in the past five years was misleading. For a better understanding, we reproduce that portion of the application.

"8. Have you consulted physicians or other practitioners in the past five years? Yes ☒ No ☐ (If yes, describe below.)
"REASON DATE PHYSICIAN'S NAME AND ADDRESS
"a. For Work Permit 1/1/59 Dr. Howard Bryant, Hoquiam, Wash."

In fact, while the application indicated that his only consultation with Dr. Howard Bryant had been in January, 1959, to secure a work permit, he had consulted Dr. Bryant many times since 1957.

D. The answers indicated that he was in good health and free from bodily impairment, when in fact he was not in good health as the cause of death made apparent.

The answers to the questions on the application were

filled in by the agent of the insurance company and signed by the insured. The plaintiff was present with her husband, the insured, when the application was prepared. Her testimony was that her husband did not read the application at the time he signed it. As to A, B, and C, *supra*, she testified that the insured told the agent the truth in response to the questions about his electrocardiograms, chest pains, high blood pressure, and frequent consultations with Dr. Bryant. She testified further that while her husband knew he had some heart trouble, he did not know that he had "heart disease."

As to D, *supra*, the plaintiff admitted that her husband had said he was in good health, but took the position that they both believed that he had recovered and was in good health.

A copy of the policy (with photostatic copy of the application attached and made a part thereof) was mailed to the insured and received about June 15, 1959. Prior to its receipt, he had consulted Dr. Bryant again on June 3, complaining of a pain in his chest; an electrocardiogram taken at that time showed an "anterior myocardial ischemia." There was testimony that he had examined the policy after it was received in the mail, but no proof as to what parts of it he had read.

The jury returned a verdict for the plaintiff in the sum of $7,500, the amount payable under the policy at the time of death.

The insurance company appeals.

The plaintiff gives no consideration, in her brief, to the cases on which the insurance company relied to establish that the representations made materially affected the acceptance of the risk or the hazard assumed by the insurer,[2]

---

[2]The applicable Washington statute is RCW 48.18.090:

"(2) In any application for life or disability insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

because the plaintiff did not contest those issues, but instead relied on the hypothesis that the insured answered the material questions truthfully and that the insurance company's agent falsified the answers; and relied upon the law that, in such a situation, the knowledge of the agent is the knowledge of the insurance company.

We will assume that the insured answered all of the questions truthfully and in good faith; and that, as testified, the insured was given no opportunity to read the application before signing it. In short, we make all assumptions favorable to the good faith and honesty of the insured up to June 15, 1959, when he received his copy of the insurance policy with the photostatic copies of the application attached and made a part of the contract of insurance.[3] He then had an opportunity to read the answers to the application to ascertain whether they had been correctly recorded. He not only had the opportunity to do this, but it was his duty so to do.

The rule on which we rely is clearly stated in *New York Life Ins. Co. v. Fletcher* (1886), 117 U. S. 519, 534, 29 L. Ed. 934, 6 S. Ct. 837.

"There is another view of this case equally fatal to a recovery. Assuming that the answers of the assured were falsified, as alleged, the fact would be at once disclosed by the copy of the application, annexed to the policy, to which his attention was called. He would have discovered by inspection that a fraud had been perpetrated, not only upon himself but upon the company, and it would have been his duty to make the fact known to the company. He could not hold the policy without approving the action of the agents and thus becoming a participant in the fraud committed. The retention of the policy was an approval of the application and of its statements. The consequences of that approval cannot after his death be avoided."

A recent en banc opinion in *Comer v. World Ins. Co.* (1957), 212 Ore. 105, 128, 318 P. (2d) 916, quotes with

---

[3] It is stated in the policy, "This policy and the application therefor, a copy of which is attached, constitute the entire contract."

approval the following statement[4] from Appleman, Insurance Law and Practice, § 9405:

" 'Where an application is attached to a policy and the policy is accepted and retained by the insured, the general rule is that he is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein, so that he is estopped to claim that he did not make such statements, or that he gave true information and that such answers were those of the insurer's agent, * * * .' "

Couch on Insurance, 2d Ed. 35.211, agrees with Appleman, *supra,* that the majority view is that:

". . . the insured is bound by misstatements appearing in an application attached to the policy delivered to and retained by him. . . ."

Couch indicates that the reasoning in the cases is that the insured has the opportunity of examination and is under a duty to read over his application attached to the policy.

This rule was specifically recognized (but not applied) in *Boggio v. California-Western States Life Ins. Co.* (1952), 108 Cal. App. (2d) 597, 600, 239 P. (2d) 144, where it was said:

"Defendant correctly states that when the insured has a copy of the application in his possession he is presumed to have read it, and to be aware of any misstatements therein even though they were not due to his own fault (citing *Telford v. New York Life Ins. Co.*, 9 Cal. 2d 103, 107 [69 P. 2d 835], *Layton v. New York Life Ins. Co.*, 55 Cal. App. 202, 203 [202 P. 958], and other cases). . . ."

A recent expression of the New York courts is found in *Brauman v. Prudential Ins. Co. of America* (1956), 157 N. Y. S. (2d) 631, 632:

". . . The insured had a duty to read the application which was attached to the policy and to correct any misstatements contained therein. This duty survives the completion of the application by the agent and the failure of the insured to read it before he signs it. Minsker v. John Hancock Mutual Life Insurance Company, 254 N. Y. 333,

---

[4]Three judges concurred in the result, but did not approve the statement.

173 N. E. 4, 81 A. L. R. 829; Stanulevich v. St. Lawrence Life Association, 228 N. Y. 586, 127 N. E. 315."

In this state we have no life insurance cases bearing directly on this point, but we do have automobile insurance cases in point. *Hayes v. Automobile Ins. Exchange* (1923), 126 Wash. 487, 218 Pac. 252. Reaffirmed in an en banc opinion (1924), 129 Wash. 202, 224 Pac. 594. See also *Perry v. Continental Ins. Co.* (1934), 178 Wash. 24, 27, 33 P. (2d) 661, which quoted the following from the *Hayes* case, *supra*:

" 'Whether the application was filled out by the insurance company's agent becomes immaterial, for the respondent knew that the statements made therein were not based upon any facts detailed by him, and when he accepted the policy and is charged with having read it, he then, in legal effect, made for the first time the false statements with knowledge of their falsity, and the fact that they appeared there as a result of the agent's failure to inquire the facts of him does not make them any the less his own misstatements.' "

While not relating to the reading of applications made a part of the policy, we do have other insurance cases holding squarely that it is an insured's duty to read his policy. *Carstensen v. Standard Acc. Ins. Co.* (1941), 8 Wn. (2d) 72, 111 P. (2d) 565; and *Carew, Shaw & Bernasconi v. General Cas. Co.* (1937), 189 Wash. 329, 341, 65 P. (2d) 689. In the *Carew* case it is said:

" . . . Appellant is presumed and is required to know the provisions of the insurance contract, as it would any other written contract into which it enters. It will not do for appellant's vice-president to say that he did not read the policy. Whether he or any of the other officers or agents of appellant read the policy, is immaterial. It was appellant's duty to read the policy, and the law says that that was done. *Hubenthal v. Spokane & Inland R. Co.*, 43 Wash. 677, 86 Pac. 955; *Hayes v. Automobile Ins. Exchange,* 126 Wash. 487, 218 Pac. 252; *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P. (2d) 661; *McCann v. Reeder,* 178 Wash. 126, 34 P. (2d) 461; *Kelley v. Von Herberg,* 184 Wash. 165, 50 P. (2d) 23."

 The *Hayes* and *Perry* cases have been criticized,[5] and we recognize that there is a sharp division of authority. We are convinced that we should, particularly in life insurance cases, adhere to the rule that an insured, by accepting and retaining a policy with the application made a part thereof, thereby makes any false representations in the application his own.

Cases such as these arise only when the insured has died within a relatively short time after the issuance of the policy, because life insurance policies by statute[6] are incontestable after two years. Again and again the fact pattern in the cases involving these short-lived insureds show their truthful disclosures to the insurance agent of stomach ulcers, heart involvements, prior operations, or prior refusals of insurance. They sign the application prepared by the insurance agent without reading it and have no curiosity about its contents when it is delivered to them as part of their insurance policy. We think it is entirely proper to hold, as so many courts have done: That good faith toward the insurer, as well as reasonable care on the part of the applicant, requires an examination of the application on which their contract is based; and that a failure to report any false statements amounts to a ratification.

The Court of Chancery of Delaware made such a holding in *Prudential Ins. Co. of America v. Ford* (1958), 144 A. (2d) 234, 237, and said:

"In insurance matters the duty of utmost fair dealing rests not only on the insurer, but on the insured, uberrimae fidei being required of both parties, . . ."

We have disposed of this case on the basis of what we believe to be the application of sound principles of life insurance law. It is, however, *sui generis,* and could, and

---

[5]10 Wash. L. Rev. 78.

[6]"There shall be a provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of two years from its date of issue, except for nonpayment of premiums . . ." RCW 48.23.050

perhaps should, be disposed of on the basis that to permit the plaintiff to recover under the circumstances here existing would be an unjust enrichment of the plaintiff and a legalized mulcting of the insurance company. This case, by reason of its peculiar features, belongs in an eddy and not in the main stream of judicial decision.

 We begin with the fact that this somewhat unusual type of policy, written on the life of an apparently uninsurable person, was for the benefit of the First Federal Savings & Loan Association of Hoquiam "as its interest may appear, otherwise to Marieta Hein, wife." The savings and loan association had just loaned the insured and his wife (the plaintiff) the sum of $6,850 and had taken a mortgage on their home and certain rental property. This insurance was originally for $7,800 on the basis of the insured's being 39 at the time of his application. With each succeeding birthday the amount payable decreased. The decrease was at the rate of $300 a year for eighteen years, and then at varying lesser amounts until its termination, when he became 75. (Hein became 40 three days after the date of issue, so the amount due under the policy at the time of his death a few months later was $7,500; incidentally, had the application been made three days later he, being 40 years of age, would have had to take a medical examination to get the insurance.)

The fact that the agent of the insurance company, who took the application and allegedly falsified[7] the answers thereon, was also the president of the savings and loan association (the beneficiary of the policy "as its interest may appear") makes the situation a bit sticky. Note, too, the primary beneficiary paid the premium. The application reads:

"I hereby authorize and request First Federal Savings

---

[7] We have been compelled to assume throughout the opinion the fraudulent conduct of the agent for the insurance company, who was also the president of the savings and loan association, because we have to take the case for the plaintiff at its strongest. It should be noted that his testimony was that the answers he placed on the application were the answers given him by Mr. Hein.

& Loan Ass'n. of Hoquiam to pay the premiums for the insurance applied for herein as they become due and to add all sums so paid to my loan. I agree to increase my monthly loan payments by $6.00." (This took care of the $72 annual premium.)

The savings and loan association had paid the $72 premium, and the Heins had made eight or nine monthly payments of $6 each by way of repayment when Mr. Hein died.

Our view is that any payment to the plaintiff, in excess of the portion of the premium paid with community funds, is an unjust enrichment. Her husband, as an individual, could have secured no insurance from this company; it wrote only a specialty type of insurance (to insure the repayment of creditors in the event of the death of a debtor) at a premium much lower than ordinary life insurance could be written. There can be no contention that Mr. Hein could have acquired for $72 insurance in the amount of $7,800 or $7,500 for a year, a rate of less than $10 per thousand.[8] He has lost nothing to which he or his beneficiaries were entitled but the premiums paid, for which reimbursement has been offered by the insurance company.

The plaintiff is better off by the result reached in the trial court than if no fraud had been committed, for if there had been no fraud the savings and loan association would have received the amount of its mortgage and the plaintiff would have received the excess over the amount due the savings and loan association. While the payment to the savings and loan association would, of course, have been beneficial to the plaintiff, she now has a preferable position because she gets the $7,500 to do with as she pleases. Of course she could, if she desired to do so, pay the savings and loan association the mortgage debt, but she is under no obligation to do so.

As a *sui generis* proposition, the payment to the plaintiff (by the insurance company) of anything more than her share of the initial premium of $72, would constitute an

---

[8]We take judicial notice that the insurance rates for $7,500 life insurance for a man 39 years of age, in good health, would be between two and three times the premium that was paid in this case.

unjust enrichment, if the insurance was secured on an uninsurable person by reason of the fraud of the primary beneficiary.

The judgment on the jury verdict is set aside and the case dismissed.

FINLEY, C. J., WEAVER, ROSELLINI, and FOSTER, JJ., concur.