JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY *vs.* LORENE E. SCHWARZER & another.

Suffolk. March 7, 1968. — May 9, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Insurance,* Application for policy. *Estoppel.*

An insurance company was not entitled to have declared void a hospital expense policy issued by it because of falsity of statements in the application therefor where it appeared that, when the company's soliciting agent called upon the applicant, she was not asked to read the application and did not do so, that she gave the agent true information about illnesses and hospitalization and had no intent to deceive, that the agent filled out the application in his own hand and put down false answers as to such matters, that he told the applicant the company would investigate, there would be a waiting period, he would tell the company what she had told him, and if there was any question he would notify her, and that he subsequently delivered the policy to her.

BILL IN EQUITY filed in the Superior Court on September 20, 1965.

The suit was heard by *Mitchell,* J.

*Edward J. Duggan (Joseph F. Ryan* with him) for the plaintiff.

*William R. Sullivan* for the defendant Lorene E. Schwarzer (*Melvin R. Pearlman,* for the defendant New England Sanitarium and Benevolent Association, with him).

WHITTEMORE, J. The company's bill of complaint seeks

to have declared void a hospital expense policy issued by it to Lorene Schwarzer, because of the falsity of statements in the application signed by her. The judge found that the soliciting agent of the company was responsible for the false statements, and that they were due to no fault of Lorene. He ruled, on the authority of *Sullivan* v. *John Hancock Mut. Life Ins. Co.* 342 Mass. 649, 654–655, that the company could not avoid the policy.

Facts set out in, or apparent from, the judge's subsidiary findings include the following: On or about September 10, 1963, John Barletta, an authorized agent of the company, called on Lorene at her place of employment, produced an application form and filled it out in his own hand. Lorene told him she had had a John Hancock policy at a former time and found it satisfactory; she had been in the hospital in July and August for a kidney infection and her employer's Blue Cross-Blue Shield coverage was not enough. In answer to a question as to whether she had been in the hospital before, she said she had, several times, for back surgery related to a high school accident. The condition, she further answered, was arrested as far as she knew. Barletta told her the company would investigate, there would be a month's waiting period and if there was any question he would notify her. He asked no other questions except her age, marital status, occupation and business address. He wrote the answers to these questions and to others and he kept saying "No" as he checked off parts of the application. He asked her to sign and when she had done so he told her that if she were hit by a truck the next day she was insured. Truthful answers to questions to which Barletta gave the false answer "No" without reading the questions to Lorene would have disclosed the information volunteered by her and additional information. Lorene at no time read the application nor was she asked to. She had no intent to deceive. She paid the first premium by check, handed to Barletta, on September 10, 1963. The company issued the policy about September 23 and she received it in October, and paid monthly premiums until March, 1964.

Consistent with the findings are corroborative facts stated in Lorene's testimony that Barletta said "he was going to tell the manager what I told him" and "if there is any question I'll notify you here at the bank"; "[h]e came back in October with my policy" and collected the premium each month thereafter.

Lorene was hospitalized for a period beginning on March 31, 1964. The company rejected the hospital's claim under its policy and tendered back the premiums. The judge found that the misrepresentations in the application "materially affected . . . the acceptance of the risk . . . [and] the hazard assumed" by the company. G. L. c. 175, § 108, cl. 5 (c). It would not have issued the policy if it had been informed of the medical history by truthful answers.

In the *Sullivan* case, we applied the rule that when the applicant gives correct oral answers which are incorrectly recorded by an authorized agent (in that case the examining physician) the insurer cannot rely on the falsity of such answers to avoid the policy.

Another well established principle, now relied on by the company, is that the acceptance of a contract establishes all its terms. See for example *Long* v. *Agricultural Ins. Co.* 257 Mass. 240; *Thomas* v. *Commercial Union Assur. Co.* 162 Mass. 29, 34; *Cass* v. *Lord,* 236 Mass. 430. In most jurisdictions this principle in one form or another is applied to insurance policies. Couch, Insurance (2d ed.) § 35:211, states that by the majority view the insured is bound by misstatements appearing in an application attached to the policy delivered to and retained by him. Appleman, Insurance Law and Practice, § 9405, states that it is the general rule. Compare Williston, Contracts (3d ed.) § 751. The rule has been applied in jurisdictions which apply or had applied the equitable estoppel doctrine. See cases cited in the next paragraph; *Hein* v. *Family Life Ins. Co.* 60 Wash. 2d 91, to be read with 10 Wash. L. Rev. 78, 85–88, and cases there cited; Vance, Insurance (3d ed.) § 44, pp. 265–266. Compare *Prudential Ins. Co.* v. *Ford,* 37 Del. Ch. 425, 429–430 (1958) (duty to read policy), with *Rust* v. *Metropolitan Life*

*Ins. Co.* 36 Del. 199, 206–208 (1934) (estoppel of insurer).

The rigorous application of this rule in effect wipes out the equitable estoppel doctrine. *Metropolitan Life Ins. Co.* v. *Alterovitz,* 214 Ind. 186. *Gillan* v. *Equitable Life Assur. Soc.* 143 Neb. 647. *Minsker* v. *John Hancock Mut. Life Ins. Co.* 254 N. Y. 333. *Comer* v. *World Ins. Co.* 212 Ore. 105, 131. All four of these jurisdictions had applied the estoppel doctrine in cases prior to the adoption of a statute under which the application is included in the policy. See G. L. c. 175, § 108, cl. 5 (a).

The *Sullivan* case implicitly rejects the view that acceptance of the policy is conclusive where the elements of equitable estoppel are present, and thus limits the effect of such of our cases as those cited above. True, the contract principle was not discussed in that case, not having been relied on by the company or directly presented.[1] But the evidence showed that the insured had accepted the policy,[2] and we deem the principle of that case to control this one. That is, notwithstanding the general contract rule, the particular conduct giving rise to the estoppel may be such as to excuse the reading of the policy. See *Rutherford* v. *Prudential Ins. Co.* 234 Cal. App. 2d 719, 726–728; *Ruggirello* v. *Detroit Auto. Inter-Ins. Exch.* 272 Mich. 44, 48–51; 16 Cornell L. Q. 235, 238–240 commenting on the *Minsker* case.[3]

---

[1] The issue there was whether, in view of false answers inserted by the agent unknown to the applicant, any contract came into existence. The company contended that there was missing an essential element intended by both parties, that is, an application by the applicant. An alternative defence was that by relying on a contract which included the false application the insured constructively made false statements which he knew to be false.

[2] This was three days before his admission to the hospital following the cerebral aneurysm that led to his death on May 8, 1957. One view is that acceptance is determinative only if the insured has a reasonable opportunity to read the policy. *Layton* v. *New York Life Ins. Co.* 55 Cal. App. 202, 206–207. *Metropolitan Life Ins. Co.* v. *Samis,* 172 Md. 517. *Martin* v. *Oregon Ins. Co.* 232 Ore. 197, 213.

[3] "Their authors [of another set of decisions] have felt that the law should not impose upon the applicant an absolute duty to read the policy and application in anticipation of a fraud or mistake on the agent's part. . . . Underlying these holdings is a recognition of the everyday practice of the purchaser of insurance. He seldom reads the policy and application, either because he cannot understand its detailed and technical terms, or because of a failure to realize its importance. He is merely interested in buying 'pro-

Even if Lorene had read the application with the policy she would not necessarily have been informed of a defect. The policy was delivered to her by the agent who had told her that he would tell the company what she had told him about her illnesses and hospitalization, and would notify her if there was any question. His delivery of the policy was an implied representation that he had reported to the company and that the information given by her was not material to defeat the issuance of the policy. He asserted, in effect, that she had done all that was necessary to enable the company to issue to her a valid policy and that the company had done so. It was reasonable for Lorene to accept Barletta's express and implied assertions. See Vance, Insurance (3d ed.) § 88, p. 528.

We recognize that the limitation here applied upon the rule that one accepting a contract is bound by all its terms, in alleviating the overreaching of applicants, also risks fraudulent imposition by applicants upon insurers. The control, however, of this sort of imposition, either on the applicant or the insurer, lies to a substantial extent within the insurer's power in the modification of procedures for obtaining and submitting applications.

We have considered all the points argued.

*Decree affirmed.*

---

tection', and he tends to rely on the good faith and skill of the insurer's agent, who is presumably an expert in such matters. . . . The insurance contract has been regarded as unlike the ordinary contract in that it is prepared by the insurer, and the insured must take it 'as is.' Consequently, courts have not applied contract principles whenever the justice of the particular case seemed to require it. . . . The [*Minsker*] case may lead to harsh decisions depriving the innocent careless of the 'protection' they think they have purchased."