**Leola BLAIR, Appellant,**

v.

**The PRUDENTIAL INSURANCE CO. OF AMERICA.**

**No. 71–1096.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 12, 1972.

Decided Dec. 29, 1972.

5.  473 F.2d 334 (4th Cir. 1973) (*en banc*).

6.  Id. at 336 (emphasis added).

Mr. Louis H. Cohen, Washington, D. C., for appellant.

Mr. John Eris Powell, Washington, D. C., for appellee.

Before LEVENTHAL and ROBB, Circuit Judges, and FRANK A. KAUFMAN,* U.S. District Judge for the District of Maryland.

FRANK A. KAUFMAN, District Judge:

On May 1, 1968, one of defendant insurance company's agents visited the

* Sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

home of Melvin and Leola Blair in the District of Columbia and obtained from Melvin, employed as a security guard, an application for an insurance policy on Melvin's life pursuant to which Leola, his wife, the manager of a government agency's snackbar, was the named beneficiary. The policy, which called for premiums of $12.73 per month, was issued on May 20, 1968. After Melvin died on February 16, 1970, defendant refused to make payment under the policy, on the ground that there had been material misrepresentations in and material omissions from Melvin's application in connection with his medical history. Defendant's tender of payment of the total amount of the premiums ($208.06) paid prior to Melvin's death was refused by Leola Blair, who instead instituted suit in the court below seeking damages in the amount of $12,752.-73.

The policy contains the usual provisions that no agent "has authority * * * to bind the Company by making any promise or representation or by giving or receiving any information," and that "[t]he policy, together with the application, * * * constitutes the entire contract." While counsel for plaintiff contended otherwise in this Court, it is clear, as the court below found upon granting defendant's motion for summary judgment and denying plaintiff's similar motion, that the application "contained material misrepresentations affecting the acceptance of the risk." Specifically, the application failed to reveal that from November, 1966 to November, 1967 Melvin Blair was treated regularly by a doctor for high blood pressure, hypertension and obesity, and that the doctor prescribed medicine for that high blood pressure and advised Blair to go on a diet.[1] Further, Mrs. Blair seemingly concedes the truth of the alleged omitted facts. However, she has stated in an affidavit filed in this case that her husband orally

informed defendant's agent of all of those facts on May 1, 1968, when the application form was being jointly worked on, discussed between, and completed by that agent and her husband in her presence in the Blairs' home; that the agent at that time requested Melvin Blair to sign the application form in blank, prior to its being completed; that Melvin Blair executed the application in blank; that

> [a]fter my husband signed the papers [the agent] laid the paper out on the table and orally asked my husband questions and in response thereto my husband orally answered the questions, and [the agent] in his handwriting made recordings on the form;

and that

> [a]fter my husband and I orally answered the questions asked by [the agent], which he was writing on the application, [the agent], did not show him the application he had completed, nor did he ask my husband to read the answers [the agent] had written on the application.

Mrs. Blair contends that the agent's knowledge of the actual facts of Melvin Blair's medical history is chargeable to the defendant insurer and that therefore the latter cannot avoid liability under the policy because of the misstatements in and the omissions from the application. In response, the defendant asserts that once Melvin Blair signed the application and declared under oath that the statements and answers given therein were correct and complete, it, as an insurance company, was entitled to rely upon that declaration, any oral statements by Mr. or Mrs. Blair to the agent notwithstanding. In that connection, while it contends that such oral statements, if any, are immaterial, the defendant does not concede that any such oral statements were in fact made or that the agent acted and/or directed as plaintiff has stated under oath.

---

1. Mrs. Blair has asserted in this Court that the markings in the various boxes in the application form indicate responses which if properly construed revealed all of the relevant medical facts. Those assertions are patently without merit.

■ The record in this case is devoid of facts establishing whether the policy application was accepted by defendant within the District of Columbia, or outside of the District, as, for instance, in New Jersey, Prudential's state of incorporation. However, all relevant and material acts and statements, agreed or alleged to have occurred, took place within the District of Columbia. Where "the laws of two jurisdictions are involved," in this Circuit the rule is that "the forum applies the law of the state which has the 'more substantial interest in the resolution of the issue.' "[2] That jurisdiction is clearly the District of Columbia, rather than New Jersey or any other state. However, because of the absence of any case law precedents in the District of Columbia as to the substantive question posed herein, the decisions of other courts, including those of New Jersey, have been carefully considered by this Court in this case.

■ In granting summary judgment below in this case, the trial court relied upon this Court's holding in Jannenga v. Nationwide Life Ins. Co., 109 U.S.App. D.C. 385, 288 F.2d 169 (1961). But in that case, in which the insured unsuccessfully appealed from a verdict which was entered in favor of the defendant insurer at the close of the plaintiff's case because of material misrepresentation in the application, Mr. Chief Justice Burger (then Circuit Judge) characterized (at 173) the evidence at trial as having disclosed that "the assured at the least consciously permitted an application containing material misrepresentations to be presented by subordinate agents to officers of the insurance company under circumstances which he knew negatived any probability that the actual facts would be revealed."[3] In

Jannenga, the appellant, who had attended law school and also worked as an insurance agent, applied to Nationwide for $10,000 of insurance on the life of his newly born daughter and signed an application form in which he stated that no other insurance on his daughter's life was "pending or contemplated." 288 F. 2d supra at 170. In fact, the father had, on the same day, applied to another company for $10,000 of insurance on his daughter's life, on the previous day for $5000 of insurance from a third company, and a month later for $10,000 of insurance from a fourth company. At trial, after his daughter's death, the father "testified that each of the life insurance agents told him that the [application form's] questions referred only to delivered policies and that the negative answer in the Nationwide application was entered by the agent after such explanation." 288 F.2d supra at 170 (emphasis in original). There is no indication in Judge Burger's opinion that the father made any claim that he had not read the policy application or lacked knowledge of its contents. In this case, as contrasted with Jannenga, there has been no trial, and the plaintiff has specifically alleged that her husband did not read the application form before it was submitted to the company and has stated that that failure to read as well as any material misrepresentation or omission was caused solely by the insurer's agent. In Kaitlin v. Metropolitan Life Ins. Co., 65 A.2d 188, 190 (Mun.Ct. App.D.C.1949), cited, inter alia, in Jannenga (288 F.2d at 173) in support of the Court's holding, the Court found that the insured, who alleged that the insurer's agent knew the true facts of his medical history, had himself made misstatements with regard thereto. In this case, in the context of defendant's

---

2. Fowler v. A & A Company, 262 A.2d 344, 348 (D.C.Ct.App.1970), citing Mc-Crossin v. Hicks Chevrolet, Inc., 248 A.2d 917, 921 (D.C.Ct.App.1969), Roscoe v. Roscoe, 126 U.S.App.D.C. 317, 322, 379 F.2d 94, 99 (1967); Dovell v. Arundel Supply Corp., 124 U.S.App.D.C. 89, 90, 361 F.2d 543, 544 (1966). See also Cary

v. United States Hoffman Mach. Corp., 148 F.Supp. 748, 752 (D.D.C.1957).

3. These words, utilized by Judge Burger in Jannenga, are themselves quoted from Mutual Life Ins. Co. of N. Y. v. Hilton-Green, 241 U.S. 613, 623, 36 S.Ct. 676, 60 L.Ed. 1202 (1916).

motion for summary judgment, this Court must assume that neither Melvin nor Leola Blair made any misstatements or was guilty of any material omissions and that neither of them had any actual knowledge that the agent recorded on the application form answers which were not in accord with their statements to the agent.

Under section 35–414 of the District of Columbia Code—

> [t]he falsity of a statement in the application for any policy of insurance shall not bar the right to recovery thereunder unless such false statement was made with intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the company.

Even assuming *arguendo* the facts as plaintiff states them, the misstatements in and omissions from the application would appear to have "materially affected . . . the acceptance of the risk" and "the hazard." Thus, the defendant, Prudential, would not appear barred by section 35–414 from asserting the falsity of statements in the application relating to Melvin Blair's medical history. "The test of materiality is whether the representation would reasonably influence the insurer's decision as to whether it should insure the applicant. . . . And where the evidence warrants, materiality may be found as a matter of law." Jannenga v. Nationwide Life Ins. Co., *supra* at 172. The defense of material misrepresentation, however, is in its true nature an equitable defense. As such, the question presented in this case is whether an insurer may successfully interpose the defense of misstatement of, or omission to state, material medical facts in an application form where, assuming as we must in the context of de-

fendant's motion for summary judgment, the applicant, at the request of the insurer's agent, signed the application form in blank, the applicant and his wife orally gave truthful and full answers to the questions on the application form as they were propounded by the agent, the agent himself recorded one or more material misstatements of fact on the application form or omitted to record material information, and neither the applicant nor his wife knew of the agent's entry on the application form of any such misstatement or of the agent's omission of any material information, or read the application form either before its submission to the insurer, or after the policy was issued and returned to the insured with the application form in reduced form attached to and made part of the issued policy. There are cases in which courts have held that when an applicant signs an application form in which the agent has recorded information different from that given to him by the applicant, and the applicant has not read the application before signing it and has not otherwise verified the information in it, the insured is bound by the answers set forth in the application form. *See, e. g.,* New York Life Ins. Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934 (1886). *Cf.* Mutual Life Ins. Co. of New York v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202 (1916); Lumber Underwriters of New York v. Rife, 237 U.S. 605, 35 S.Ct. 717, 59 L.Ed. 1140 (1915).[4] *See also* the Maryland view reflected by Stumpf v. State Farm Mut. Auto Ins. Co., 252 Md. 696, 713, 251 A.2d 362 (1969); Nationwide Mut. Ins. Co. v. McBriety, 246 Md. 738, 741–742, 230 A.2d 81 (1967); Commercial Cas. Ins. Co. v. Schmidt, 166 Md. 562, 571, 171 A. 725 (1934).[5] But in each of the Maryland cases, the deci-

---

4. All three of those cases were decided long prior to Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); in addition, none of the three dealt with District of Columbia law.

5. *But cf.* Cohen v. American Home Assurance Co., 255 Md. 334, 340–341, 258 A.2d 225 (1969), in which the Court of Appeals of Maryland, with seeming approval, set forth a lengthy quotation from 43 Am.Jur.2d, Insurance, § 209

sion adverse to the claimant came after trial and a full development of the facts. Presumably, even in Maryland, a claimant could advance a reason for nonreading sufficient to enable him to overcome the defense of misstatement.

An examination of the authorities reveals that American courts have adopted a number of different positions when confronted with the question posed in this case. Some, like Maryland, have placed a heavy and perhaps an almost insurmountable burden on the applicant to read and to be responsible for all statements in or omissions from the application submitted by him. Others, recognizing that insurance companies "through advertising and tradition have created for themselves the image that they and their employees are above suspicion," have held that insurers should "not be allowed to hide behind the defense which strict contract law would provide." Note, Can a Beneficiary Collect on an Insurance Policy After Agent Places False Answer in Application?, 35 Southern Calif.L.Rev. 506, 512 (1962), discussing, *inter alia*, various middle-of-the road positions and the reasons for their adoption by some courts.

■ In the absence of any controlling District of Columbia precedent,[6] this

---

(1969), which includes the statement that "an insurer is liable on a policy issued on an application signed only by its agents in their own names, notwithstanding false representations in the application, where the insured is not responsible for such misrepresentations."

6. While Maryland decisions are entitled to "great weight" and "of greater weight than the decisions of other States," Gerace v. Liberty Mutual Insurance Co., 264 F.Supp. 95, 97 (D.D.C.1966), particularly perhaps in probate matters, *see* Linkins v. Protestant Episcopal Cathedral Found., 87 U.S.App.D.C. 351, 187 F.2d 357, 360 (1950), and in real estate matters, *see* In re Estate of Parnell, 275 F.Supp. 609, 610 (D.D.C.1967), aff'd sub nom. White v. Parnell, 130 U.S.App. D.C. 148, 397 F.2d 709 (1968), this Court is not bound to follow the decisions of the courts of Maryland, particularly if they were handed down subsequent to the organization of the District of Columbia. Phillips v. Negley, 117 U.S. 665, 678, 6 S.Ct. 901, 29 L.Ed. 1013 (1886). *See also* Morris v. United States, 174 U.S. 196, 240, 19 S.Ct. 649, 43 L.Ed. 946 (1899). As Judge Bastian wrote in White v. Parnell, *supra*, 397 F.2d at 710 n. 1, "we look to the laws of Maryland for guidance when a question novel to our law is before us. This statute [*i. e.*, 49 D.C.Code 301 (1967)] does not demand blind allegiance, however, *particularly as to the common law*." (Emphasis supplied.) That statute, enacted in 1901, reads as follows:

The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general Acts of Congress not locally inapplicable in the District of Columbia, and all Acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except in so far as the same are inconsistent with, or are replaced by, subsequent legislation of Congress. According to the annotation in Vol. 19, District of Columbia Code Encyclopedia (1967), that 1901 statute finds its derivation in Act of February 27, 1801, ch. 15, § 1, 2 Stat. 103, which provided, in relevant part:

* * * ; and that the laws of the state of Maryland, as they now exist, shall be and continue in force in that part of the said district, which was ceded by that state to the United States, and by them accepted as aforesaid. * * *

In Linkins v. Protestant Episcopal Cathedral Found., 187 F.2d *supra* at 360–361, Judge Prettyman wrote as follows concerning the present statute which was enacted in 1901:

Appellants say this provision means that, absent a statute on a particular legal question, the common law as it existed in 1801—not as it has grown and developed to the present time—governs. The simple answer is that the statute does not so provide. Commas enclose the phrase "all British statutes in force in Maryland on February 27, 1801," and make it clear that the time limit of 1801 was meant to apply only to "all British statutes". We do not think Congress intended to freeze the common law at March 3, 1901, *or at any other date.*

* * * We have never hesitated to exercise the usual judicial function of revising and enlarging *the common law.* [Emphasis supplied; footnote omitted.]

Court adopts the view set forth by Chief Justice Vanderbilt in Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 105 A.2d 526 (1954). In that case, citing, *inter alia* (at 105 A.2d *supra* at 530), 17 J. Appleman, Insurance Law and Practice § 9401 (1945), and holding imputable to the insurance company actions by its agent in entering answers on the application form which were not in accordance with information furnished orally by the insured, Justice Vanderbilt wrote that "[i]n order to determine whether equitable relief by way of reformation should be granted it is necessary to look at all the facts" (105 A.2d *supra* at ·530). In *Heake,* the fraud practiced by the agent consisted of recording the applicant's age as twenty-three when the latter was seventeen; the policy was unusual in terms of numbers of pages, size of print, and remote locations of endorsements; and the applicant did not read the application. The teaching in *Heake* illustrates the heavy burden placed upon an insured, who has not read information fraudulently written into his application by an insurance company's agent, to show why he should be entitled to relief. *See* Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co. of Hartford, 97 N.J.Super. 149, 234 A.2d 683, 714–716 (1967), citing and discussing *Heake* and stating (at 716) that—

. . . at this juncture the law in New Jersey is generally that one who sues an insurance company in fraud and deceit for the acts of its agent, and who could have protected himself by an examination of the policy, is under an obligation to do so. This rule is subject to the exception carved out by *Heake* to the effect that such a duty is lifted from a defrauded insured when all the circumstances combine to render inequitable its imposition.

Under New Jersey's view, the insured, or his beneficiary, is given an opportunity to explain what he did or did not do, and why, and what the insurer's agent did—and to show why the insurer should be equitably estopped from resisting payment under the policy because of the misstatements in or omissions from the application. The same approach has been taken by the Supreme Judicial Court of Massachusetts. In John Hancock Co. v. Schwarzer, 354 Mass. 327, 237 N.E.2d 50, 52 (1968), that Court invoked the doctrine of equitable estoppel to excuse non-reading of the life insurance application, holding that result to be implicitly required by its earlier holding in Sullivan v. John Hancock Co., 342 Mass. 649, 174 N.E.2d 771 (1961), in which, as likewise alleged by Mrs. Blair herein, the insured gave correct answers and the agent wrote down false answers. In *Sullivan,* the Court (at 774) stated:

\* \* \* It would be unfair to permit an insurance company to avoid a contract of insurance because of the failure of a company's own insurance agent or examining physician correctly to record the answers given by an applicant. In this highly competitive business (see 62 Harv.L.Rev. 87, 91, 93) with the complexity of the varied types of insurance existing today, it has been recognized that applicants frequently do in fact rely upon a company's representatives. The courts have been unwilling to permit the companies to assert as a defence the inadequate or improper performance of these representatives.

One year after the *Schwarzer* decision, the Appellate Court of Illinois, in the course of reversing entry of summary judgment for the insurer, wrote in Oberg v. John Hancock Mutual Life Ins. Co., 114 Ill.App.2d 152, 251 N.E.2d 918, 923 (App.Ct. of Ill. 1969): "Probably the weight of modern authority sustains the rule that when an applicant gives correct oral answers which are incorrectly recorded by an authorized agent, the insurer cannot rely upon the falsity of such answers to avoid the policy." In support of that proposition the Illinois court cited the Massachusetts opinion in *Schwarzer* and also opinions of the high-

est courts of Kansas, Nebraska, Vermont and Ohio.[7]

It may be argued that the approach taken by some courts such as those of New Jersey and Massachusetts opens the door for false claims to be visited by claimants upon insurers. But insurance companies can protect themselves by instructing their agents not to fill in the answers to questions on application forms and to require such answers to be written by the applicants themselves, or in the alternative, to set up internal company procedures pursuant to which any application form which contains answers written by an agent is given careful, additional screening, which, for instance, in this case, would seemingly have led Prudential to utilize the medical authorization given by Melvin Blair and to have obtained reports from the doctors whom Melvin Blair consulted.

There remains one additional point for discussion. The policy was delivered by Prudential to Melvin Blair without the medical authorization pursuant to which the latter had directed any physician to give Prudential any information it requested about his past medical history. Section 35–1002 D.C.Code, Validity of Policy—Good Faith of Insured Material Element—Unsound Health as Defense, provides in part:

\* \* \* Proof by the insurer of fraud, intent to deceive, unsound health, bad faith, breach of warranty or condition precedent, or other matter of defense; shall be subject to the provisions of section 35–203.

Section 35–203 D.C.Code, Copy of Application to be Delivered with Policy— Statement in Application as a Defense, provides in part:

Each life insurance company . . . doing a life insurance business in the District of Columbia shall deliver with each policy issued by it a copy of the application made by the insured so that the whole contract may appear in such application and policy, in default of which no defense shall be allowed to such policy on account of anything contained in, or omitted from, such application.

In Washington Fidelity Nat. Ins. Co. v. Burton, 287 U.S. 97, 53 S.Ct. 26, 77 L.Ed. 196 (1932), the insurer failed to deliver with the policy a copy of the application. Holding that the insurer should nevertheless be permitted to introduce evidence at trial that the insured had failed to disclose his lack of sound health when he applied for the coverage, Mr. Justice Butler wrote (at 99–100, 53 S.Ct. at 27):

\* \* \* The construction generally put upon enactments like the one before us indicates that the principal if not the only purpose is that, if there be an application, a copy of it shall be attached to or otherwise delivered with the policy, so that the documents showing the entire agreement shall be made available to the insured. That serves to guard the insured against misunderstanding as to his contract, and, in case of controversy with the company, to protect him against surprise, inconvenience, and danger of injustice liable to arise where the policy does not contain the entire agreement and refers for parts of it to applications or other papers. That purpose

---

7. In the Sullivan case, Judge Spiegel wrote (174 N.E.2d at 773):

    \* \* \* In jurisdictions outside Massachusetts, the great weight of authority holds that when an applicant gives correct oral answers to an examining physician but the answers are incorrectly recorded by him the insurance company cannot rely on the falsity of such answers to avoid liability under the policy issued upon the application. See annotations 33 A.L.R.2d 615, 658; 148

A.L.R. 507; 117 A.L.R. 790; Williston, Contracts (Rev. ed.) § 751, p. 2130; Appleman, Insurance Law and Practice, §§ 9401, 9402, 9409–9412, 9415, 9416.

And (at 774) the *Sullivan* opinion holds:

    Under the majority doctrine in the circumstances of the present case it was a question of fact for the jury whether truthful answers were given by the insured and improperly recorded by an agent of the defendant.

is reflected clearly by the clause that, in default of the required delivery of a copy of the application, no defense shall be allowed to such policy on account of anything "contained in, or omitted from, such application." And the barring of such defenses is the *only* consequence declared to result. [Footnote omitted; emphasis added.][8]

The medical authorization form signed by Melvin Blair did not contain or call for any information. Thus, it is neither an aid to defendant nor a deterrent to plaintiff in this suit. The failure to attach the medical authorization form to the policy is therefore immaterial and does not bring into play the bar of section 35–203 or preclude Prudential from defending on the ground of the insured's failure to disclose his medical history.

On the other hand, Prudential may not hoist itself into a position of invulnerability by asserting reliance upon the application form which was attached to the policy. The statutory provisions set forth in section 35–203 were enacted for the protection of the insured, not the insurance company. While the insured is seemingly under an absolute duty to read and to be responsible for what he himself has written, it is another thing to hold that there is an absolute bar to recovery under the policy when an agent has falsely recorded information after leading the applicant to believe that all information the applicant furnished had been recorded fully and accurately. This is so even if the applicant failed to read the reduced copy of the application form attached to the issued and delivered policy and to make out at that time what appears in the handwriting of the agent. It is to be noted, however, that in this case, the record does not disclose whether Melvin or Leola Blair, prior to Melvin's death,

ever read that reduced form after issuance and delivery of the policy.

Accordingly, for the reasons set forth herein, the order of the District Court granting summary judgment for the defendant is hereby reversed and the case is hereby remanded to the District Court for further proceedings in accordance with this opinion. It is so ordered.

ROBB, Circuit Judge, dissenting:

The question presented is whether on the pleadings and affidavits there was any issue of material fact which required a trial. Viewing the record in a light most favorable to Mrs. Blair, I think the District Court properly awarded summary judgment to the insurance company.

Mrs. Blair contends that her husband signed the application for insurance before it was completed; that he answered all questions truthfully and in good faith; that the insurance agent recorded on the application answers in part contrary to the true, full and correct answers given by Mr. Blair; and that the agent, without giving Mr. Blair an opportunity to read the application, forwarded it to the insurance company for approval.

As a matter of law, these contentions are irrelevant because twenty months before he died Mr. Blair received the insurance policy with a copy of the completed application attached. (Appellant's App. at 1.) I think the sound doctrine is that an insured is bound by misstatements or omissions appearing in an application attached to the policy and returned to him. This rule has been applied in many cases; see for example: New York Life Ins. Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934 (1886); Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L. Ed. 1202 (1916); Layton v. New York Life Ins. Co., 55 Cal.App. 202, 202 P.

8. *See* Metropolitan Life Ins. Co. v. Burch, 39 App.D.C. 399 (1912); Archer v. Equitable Life Assur. Soc., 218 N.Y. 18, 112 N.E. 433 (1916).

958 (1921); Minsker v. John Hancock Mut. Life Ins. Co., 254 N.Y. 333, 173 N. E. 4 (1930); Metropolitan Life Ins. Co. v. Alterovitz, 214 Ind. 186, 14 N.E.2d 570 (1938); Hein v. Family Life Ins. Co., 60 Wash.2d 91, 376 P.2d 152 (1962); Paxton v. Lincoln Income Life Ins. Co., 433 S.W.2d 636 (Ky.1968); Marine v. Allstate Ins. Co., 12 Ariz.App. 229, 469 P.2d 121 (1970); Smith v. Republic National Life Ins. Co., 13 Ariz. App. 228, 475 P.2d 518 (1970).

In New York Life Ins. Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934 (1886), the Supreme Court held in circumstances similar to those in this case that the insured had a duty to read the application and was bound by it. In an opinion by Mr. Justice Field, the Court said:

> It would introduce great uncertainty in all business transactions if a party making written proposals for a contract, with representations to induce its execution, should be allowed to show, after it had been obtained, that he did not know the contents of his proposals, and to enforce it, notwithstanding their falsity as to matters essential to its obligation and validity.

> \* \* \* \* \* \*

> Assuming that the answers of the assured were falsified, as alleged, the fact would be at once disclosed by the copy of the application, annexed to the policy, to which his attention was called. He would have discovered by inspection that a fraud had been perpetrated, not only upon himself but upon the company, and it would have been his duty to make the fact known to the company. He could not hold the policy without approving the action of the agents and thus becoming a participant in the fraud committed. The retention of the policy was an approval of the application and of its statements. The consequences of that

approval cannot after his death be avoided. 117 U.S. at 529, 534, 6 S.Ct. at 842, 844.

Two Maryland cases, Commercial Casualty Ins. Co. v. Schmidt, 166 Md. 562, 171 A. 725 (1934), and Metropolitan Life Ins. Co. v. Samis, 172 Md. 517, 192 A. 335 (1937), also express the rule and the reasoning that we ought to follow. In the *Schmidt* case the court held:

> Taking the testimony on behalf of the plaintiff as true, it must be assumed that the agent urged the insurance upon him, and filled in the application for it, and, for the increased or final policy now sued on, foisted on his company an application other than one which the plaintiff signed; that the plaintiff did not know, of the making of the false answers because he did not see those in the original forms of application to his company, and did not read the final policy containing them after he had received it. He knew, however, as he must have known, that he was procuring insurance against disability from accident or loss of health, and he did receive the policy, which directed his attention to the application, held it, and paid no attention to it during thirteen months subsequently, and as a consequence was not aware of the falsity in the representations as to his condition, on which the policy was procured. This court is unable to see any ground for distinguishing the case from the earlier cases in which the plaintiff was held to have become a participant by his neglect to perceive and correct the fraud. 166 Md. at 571–572, 171 A. at 729.

The court reached a similar conclusion in the *Samis* case. As the ✦Supreme Court had done in the *Fletcher* case (117 U.S. at 531–533, 6 S.Ct. 837), the Maryland court quoted with approval from Ryan v. World Mut. Life Ins. Co., 41 Conn. 168, 172 (1874): "[t]he law requires that the insured shall not only

in good faith, answer all interrogatories correctly, but shall use reasonable diligence to see that the answers are correctly written. It is for his interest to do so, and the insurer has a right to presume that he will do it. He has it in his power to prevent this species of fraud and the insurer has not." 172 Md. at 526, 192 A. at 339.

The provisions of D.C.Code § 35–203 (1967), passed in 1901, also have an important bearing on the responsibilities of the policyholder.[1] That statute requires an insurance company to include with the issued policy a copy of the application made by the insured, so as to set forth the whole contract. "The purpose of the provision is that the insured shall be furnished with a copy of the application, upon the representations in which the validity of the policy and its binding force may be made to depend." Metropolitan Life Ins. Co. v. Burch, 39 App.D.C. 397, 405 (1912).

In Minsker v. John Hancock Mut. Life Ins. Co., 254 N.Y. 333, 173 N.E. 4 (1930), the New York Court of Appeals, interpreting a similar statute, faced a situation almost identical to the one confronting us. The court had held in Sternaman v. Metropolitan Life Ins. Co., 170 N.Y. 13, 62 N.E. 763 (1902), that an insurance company, given truthful answers which would make a policy void, could not escape liability under the policy when those answers were not correctly recorded in the policy or application. The legislature subsequently passed a statute that in effect required the company to attach a copy of the application to the policy delivered to an insured. Applying this statute in the *Minsker* case, the New York court unanimously held:

The statutory rule superseded the court-made rule. . . . When an insured receives a policy, it is his duty to read it or have it read, and, if an application incorporated therein does not contain correct answers to the questions asked by the medical examiner it is his duty to have it corrected. In such circumstances a recovery will no longer be permitted because the medical examiner incorrectly recorded the applicant's answers or because the insured was unable to read or neglected to read the policy. Minsker v. John Hancock Mut. Life Ins. Co., 254 N.Y. 333, 337–338, 173 N.E. 4, 5 (1930).

Rulings so interpreting similar statutes have been made in other jurisdictions. The effect of these decisions is that in a case such as the one at bar the doctrine of equitable estoppel may not be invoked against the insurance company. Metropolitan Life Ins. Co. v. Alterovitz, 214 Ind. 186, 14 N.E.2d 570 (1938); Gillan v. Equitable Life Assurance Soc., 143 Neb. 647, 10 N.W.2d 693 (1943); Comer v. World Ins. Co., 212 Or. 105, 318 P.2d 916 (1957). The rationale is that "[t]he relationship demands fair dealing by both parties." Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 624, 36 S. Ct. 676, 680 (1916); Note, 35 So.Cal. L.Rev. 506, 510–11 (1962).

The policy reflected in these judicial decisions and legislative pronouncements is grounded in the reality of business transactions. It recognizes that the insured " ' . . . has it in his power to prevent this species of fraud and the insurer has not.' " Metropolitan Life Ins. Co. v. Samis, 172 Md. 517, 526, 192 A. 335, 339 (1937). It prevents collusion between agents and those seeking insurance. *Id.* "It protects the company from paying unjust and fraudulent claims, and at the same time protects honest policyholders from paying in-

---

[1]. "Each life insurance company, benefit order, and association doing a life insurance business in the District of Columbia shall deliver with each policy issued by it a copy of the application made by the insured so that the whole contract may appear in said application and policy, in default of which no defense shall be allowed to such policy on account of anything contained in, or omitted from, such application. (Mar. 3, 1901, 31 Stat. 1294, ch. 854, § 657; June 30, 1902, 32 Stat. 534, ch. 1329.)" D.C.Code § 35–203 (1967).

creased premiums on account of payments to dishonest and fraudulent policyholders." Metropolitan Life Ins. Co. v. Alterovitz, 214 Ind. 186, 14 N.E.2d 570, 577 (1938). On the other hand, in my judgment the rule espoused by the majority abandons a long and sound line of precedent and ignores the effect of D.C.Code § 35–203 (1967) which establishes duties and responsibilities in insurance transactions. It overlooks the ability of the policyholder to prevent a fraud, and introduces uncertainty into business relationships.[2]

Mr. Blair received his insurance policy and application on May 20, 1968 and held them without protest until his death one year and eight months later. (Appellant's App. at 1.) The application mentions some medical treatment for the insured, but it contains no reference to his treatment for high blood pressure, hypertension and obesity, even though several questions were clearly designed to elicit such information. This is patent falsification and would have been noticed in even the most cursory reading of the application. This falsification "materially affected the acceptance of the risk or hazard assumed by the company" within the meaning of D. C.Code § 35–414 (1967). In my view the insured, as a matter of law, had a duty to read the policy and application and to inform the company of such false or omitted statements about his medical history. D.C.Code § 35–203 (1967). His failure to do so made him "a participant in the fraud" and thereby voided his policy. New York Life Ins. Co. v. Fletcher, 117 U.S. 519, 534, 6 S.Ct. 837, 29 L.Ed. 934 (1886).

I dissent.

---

2. Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 105 A.2d 526 (1954) and John Hancock Mutual Life Ins. Co. v. Schwarzer, 354 Mass. 327, 237 N.E.2d 50 (1968), cited by the majority, may be distinguished on the facts. Thus in the *Heake* case Chief Justice Vanderbilt said that "[t]he result might be different . . . if the application had been attached to the policy where such documents frequently are to be found . . . ." 15 N.J. at 484, 105 A.2d at 531. In the *Schwarzer* case the court observed that "[e]ven if [the insured] had read the application with the policy she would not necessarily have been informed of a defect." 354 Mass. at 331, 237 N.E. at 53.