IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| DIGITALCHEMY, LLC,<br>a Washington limited liability<br>company, | ) ) ) ) | No. 78731-4-I |
| | ) | |
| Appellant, | ) ) | |
| v. | ) ) | |
| JOHN HANCOCK INSURANCE<br>COMPANY (USA), an insurer<br>admitted to conducted the business<br>of insurance in the state of Washington, | ) ) ) ) ) | UNPUBLISHED OPINION<br><br>FILED: November 4, 2019 |
| Respondent. | ) ) | |

VERELLEN, J. — If a life insurance company agrees to backdate a life insurance policy, then statutory and policy provisions governing death by suicide within the first two years of the policy may be implicated. Here, John Hancock Life Insurance Company (USA) terminated the insurance policy and denied coverage when insured Micah Koffron died by suicide less than two years after the policy's "Issue Date" but more than two years after the backdated "Policy Date." John Hancock's denial of coverage was consistent with the phrase "date of issue" in RCW 48.23.260(1)(b) and with "Issue Date" as defined in the policy. Digitalchemy's allegations of breach of contract and violation of RCW 48.23.260(1) were properly dismissed under CR 12(b)(6).

But an insurance policy may be reformed for mutual mistake. Policy purchaser and beneficiary Digitalchemy, LLC, alleges that the Issue Date on the face of the insurance policy was contrary to the parties' intention to backdate the policy's Issue Date, as confirmed by the Issue Date recorded in John Hancock's internal systems. Digitalchemy's mutual mistake allegations were sufficient to survive a CR 12(b)(6) motion to dismiss.

Digitalchemy also states valid claims for violations of the Consumer Protection Act (CPA)[1] and the Insurance Fair Conduct Act (IFCA).[2] Under the policy, John Hancock had an unqualified obligation to return all premiums paid upon termination of the policy due to the insured's suicide. But it conditioned return of those premiums on Digitalchemy agreeing to a sweeping indemnification and hold harmless agreement, which either misrepresented the policy or required a release beyond the subject matter that gave rise to the payment. Because either can be a per se CPA violation and the violations allegedly precluded Digitalchemy from taking possession of the premiums paid, Digitalchemy adequately alleged claims for violation of the CPA and IFCA.

We deny Digitalchemy's request for attorney fees on appeal because it fails to establish at this early stage of the proceedings that it is a prevailing party for purposes of RAP 18.1 and Olympic Steamship Co. v. Centennial Insurance Co.[3] attorney fees.

---

[1] Ch. 19.86 RCW.

[2] RCW 48.30.015.

[3] 117 Wn.2d 37, 811 P.2d 673 (1991).

Therefore, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTS

In October of 2014, the three principals of Digitalchemy decided to purchase key person life insurance policies for themselves with their company as the beneficiary. They worked with an insurance agent to buy policies from John Hancock. Because Koffron, one of the principals, had recently aged a "life insurance year," his premiums were to be higher than originally estimated. The agent offered to let Digitalchemy pay a premium to backdate Koffron's policy to September 1, 2014. On February 3, 2015, Digitalchemy and the insurance agent, acting on the behalf of John Hancock, agreed to the backdating endorsement.[4] The face of the policy identified January 15, 2015 as its Issue Date and September 1, 2014 as its Policy Date. The insurance policy also contained a suicide exclusion clause.

Koffron died by suicide on December 18, 2016. Digitalchemy submitted a claim on Koffron's policy in January of 2017, and on May 18, 2017, John Hancock

---

[4] John Hancock argues the backdating endorsement was a mere notice and could not have changed the policy "in any respect." Resp't's Br. at 10. And, the insurer argues, even if it was an endorsement, its insurance agent was not authorized to agree to endorsements on its behalf. Id. at 11. But when reviewing a CR 12(b)(6) motion to dismiss, we accept as true Digitalchemy's factual assertion that an insurance agent acting on John Hancock's behalf signed a policy endorsement intending to change the policy date in the insurance contract. See Trujillo v. Nw. Tr. Servs., Inc., 183 Wn.2d 820, 830, 355 P.3d 1100 (2015) (courts accept as true all facts alleged in a complaint on a motion to dismiss); Swanson v. Liquid Air Corp., 118 Wn.2d 512, 524, 826 P.2d 664 (1992) (whether parties intended to modify a contract is a question of fact).

denied it on the basis of suicide. The same day, John Hancock sent a check for the amount of premiums paid, a release of all claims, and a letter stating, "Negotiation of the check will be treated as your acceptance and acknowledgement of all the terms in the Release."[5] The release would obligate Digitalchemy to "defend, indemnify, and hold harmless John Hancock against any loss or liability" from any party.[6]

Digitalchemy sued John Hancock, alleging breach of contract, violation of RCW 48.23.260, reformation of the insurance contract, violations of the CPA, bad faith investigation, and a violation of IFCA. The trial court granted John Hancock's CR 12(b)(6) motion to dismiss all claims with prejudice.

Digitalchemy appeals.

<u>ANALYSIS</u>

We review a CR 12(b)(6) motion de novo.[7] Dismissal was proper if the plaintiff cannot prove any set of facts, even hypothetical facts, justifying recovery.[8] We accept as true alleged and hypothetical facts and draw all reasonable inferences in the plaintiff's favor.[9]

---

[5] Clerk's Papers (CP) at 282.
[6] CP at 283.
[7] <u>Trujillo</u>, 183 Wn.2d at 830.
[8] <u>Id.</u>
[9] <u>Id.</u>

4

## I. Whether John Hancock Breached the Insurance Contract

We construe insurance policies as contracts and give insurance policies "'a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'"[10] We read contract terms with their ordinary, usual meaning and avoid technical interpretations, except when the entirety of the contract clearly demonstrates a contrary intent.[11] "'If terms are defined in a policy, then the term should be interpreted in accordance with that policy definition.'"[12]

Digitalchemy argues John Hancock breached the insurance contract because it denied coverage under the policy's suicide exclusion provision. The suicide exclusion provision states if the insured "commits suicide, while sane or insane, within [two] years from the Issue Date, the policy will terminate on the date of such suicide."[13] The insurance policy defines "Issue Date" as "the date shown in the Policy Specifications section of this policy from which the Suicide and Incontestability provisions are applied."[14] "Policy Date" is defined as "the date

---

[10] Kut Suen Lui v. Essex Ins. Co., 185 Wn.2d 703, 710, 375 P.3d 596 (2016) (internal quotation marks omitted) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wn.2d 618, 627, 881 P.2d 201 (1994)).

[11] Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005); Jack v. Paul Revere Life Ins. Co., 97 Wn. App. 314, 318, 982 P.2d 1228 (1999).

[12] Bordeaux, Inc. v. Am. Safety Ins. Co., 145 Wn. App. 687, 694, 186 P.3d 1188 (2008) (quoting Kitsap County v. Allstate Ins. Co., 136 Wn.2d 567, 576, 964 P.2d 1173 (1998)).

[13] CP at 87.

[14] CP at 241.

from which the first premium is due . . . Policy Years, Policy Months, and Policy Anniversaries are determined from the Policy Date."[15]

Because the Issue Date in the policy specifications section is January 15, 2015, and Koffron died less than two years later on December 18, 2016, Digitalchemy concedes that the face of the policy supports John Hancock's denial of coverage. It contends, however, that the backdating endorsement amended the policy by changing both the Issue Date and the Policy Date to September 1, 2014.

The backdating endorsement is titled "Notice – Backdating/Special Dating," and states in all capital letters: "BY SIGNING THIS SECTION, I ACKNOWLEDGE THAT I HAVE READ THE FOLLOWING STATEMENT AND WANT TO ACCEPT THIS POLICY WITH THE BACKDATED/SPECIAL DATED POLICY DATE OF 9/1/2014."[16] The endorsement states its purpose is to "provide a younger issue age or service specific personal or business need[s]. To receive this benefit, you must pay the premium from the backdated/special dated policy date to the later date when coverage under the policy actually begins."[17]

The insurance contract definitions of "Policy Date" and "Issue Date" control our understanding of the policy.[18] Read with the policy, the endorsement purported to modify only the contract's policy date. Because the insurance policy clearly distinguishes its Policy Date from its Issue Date, John Hancock was not

---

[15] CP at 241.

[16] CP at 191 (emphasis added).

[17] Id. (emphasis added).

[18] Bordeaux, 145 Wn. App. at 694.

obligated to cover a death resulting from suicide within two years of the stated Issue Date of January 15, 2015. Koffron died less than two years later. John Hancock did not breach the contract by denying coverage.

## II. Whether The Insurance Contract Violated State Law

Digitalchemy argues that John Hancock violated RCW 48.23.260 by interpreting the statutory term "date of issue" to mean a later date than a policy's effective date. RCW 48.23.260(1)(b) states an insurer issuing a life insurance policy may "limit its liability to a determinable amount not less than the full reserve of the policy . . . in [the] event only of death occurring: . . . [a]s a result of [the] suicide of the insured, whether sane or insane, within two years from date of issue of the policy."[19] The critical phrases here are "within two years" and "from date of issue of the policy."

Our goal when interpreting a statute is to "'discern and implement the legislature's intent.'"[20] A statute's plain meaning is "'an expression of legislative intent.'"[21] "'Plain meaning is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found,

---

[19] (Emphasis added.)

[20] Saucedo v. John Hancock Life & Health Ins. Co., 185 Wn.2d 171, 182, 369 P.3d 150 (2016) (internal quotation marks omitted) (quoting O.S.T. ex rel. G.T. v. Regence BlueShield, 181 Wn.2d 691, 696, 335 P.3d 416 (2014)).

[21] Seattle Hous. Auth. v. City of Seattle, 3 Wn. App. 2d 532, 538, 416 P.3d 1280 (2018) (quoting Citizens All. v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015)).

related provisions, and the statutory scheme as a whole.'"[22] We may look to a dictionary to determine the plain meaning of undefined statutory terms.[23]

The statute does not give any guidance about measuring "two years," nor does it suggest the two years could be constructive or elapse by agreement. The ordinary meaning of "within two years" is a period of time less than two actual calendar years.

Digitalchemy argues the legislature intended "date of issue" to refer to "the date for which the insured paid premiums to the insurer for that coverage."[24] This equates a policy's effective date with its issue date. But the plain meaning of "date of issue" does not support this proposed definition. A "date" is "1: a statement or formula affixed (as to a piece of writing . . .) that specifies the time (as day, month, and year) and often the date of execution or making."[25] "Issue," used here as a transitive verb, means "1: to cause to come forth . . . 3a: to cause to appear or become available by officially putting forth or distributing or granting or proclaiming or promulgating."[26] For a life insurance contract, the "date of issue" is the day, month, and year when the policy was officially granted. Thus, determining whether a suicide occurred "within two years from the date of issue of the policy"

---

[22] Riddle v. Elofson, 193 Wn.2d 423, 432, 439 P.3d 647 (2019) (internal quotation marks omitted) (quoting State v. Engel, 166 Wn.2d 572, 578, 210 P.2d 1007 (2009)).

[23] Seattle Hous. Auth., 3 Wn. App. 2d at 538.

[24] Appellant's Br. at 21.

[25] WEBSTER'S THIRD NEW INT'L DICTIONARY 576 (2002).

[26] Id. at 1201.

requires reading the policy itself for the day, month, and year when it was granted and calculating whether two actual calendar years have elapsed from that date. John Hancock's understanding of "date of issue" is consistent with this reading.[27]

This view is also consistent with related statutes in chapter 48.23 RCW. For example, RCW 48.23.050 requires that life insurance policies contain "a provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of two years from its date of issue." Because the two-year period is measured against the "lifetime of the insured," backdating a policy could not accelerate passage of the policy's incontestability period. Two actual years during the insured's lifetime must elapse for the incontestability period to end. Digitalchemy's definition conflicts with this requirement, effectively reading "lifetime of the insured" out of the statute.

John Hancock's understanding of "date of issue" also harmonizes with the purposes of RCW 48.23.260(1)(b). The statute guards against fraudulent insurance applications by protecting insurers from applicants buying life insurance with the intent of committing suicide.[28] Requiring the passage of two calendar

---

[27] See Resp't's. Br. at 21 ("[T]he Issue Date for the Koffron policy is January 15, 2015, the very date that the policy was issued.").

[28] See 16 SAMUEL WILLISTON & RICHARD A. LORD, WILLISTON ON CONTRACTS § 49.89 (4th ed. 2000) ("[A] suicide exclusion policy that operates for only a short time following the policy's issuance is designed to prevent the insured from committing fraud by obtaining the policy and shortly afterward committing suicide."); 9A LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE, § 138.23 (2005) (generally accepted that buying an insurance policy with the intent to commit suicide is fraud), § 138.27 (suicide exclusion statutes operate "to the benefit of the insurer"); cf. Hein v. Family Life Ins. Co., 60 Wn.2d 91, 376 P.2d 152 (1962) (illustrating that incontestability provisions exist to guard against fraudulent insurance applications by short-lived applicants).

years from the date of issue prevents an insured from negotiating a significantly backdated policy when applying for insurance with the intention of committing suicide and then letting his beneficiaries receive the benefits of fraudulent conduct. Both John Hancock and Digitalchemy's understandings of "date of issue" support the statute's other purpose, protecting insureds and beneficiaries from being denied coverage after a long-time policyholder commits suicide.[29]

The purposes of RCW 48.23.260(1)(b) and related statutes are better supported by reading "within two years from [the] date of issue of the policy" as requiring the passage of two actual calendar years from the issue date on the policy memorializing when it was officially granted. Digitalchemy argues several related statutes support its interpretation, but its arguments are not compelling.[30] And its proposed definitions are unsupported by the statute's plain meaning or by

___

[29] See SAMUEL WILLISTON & RICHARD A. LORD, WILLISTON ON CONTRACTS § 49.92 (4th ed. 2000) (incontestability statutes were enacted to protect those insured/beneficiary "victims" who paid premiums for years and were denied coverage); § 49.90 (noting similarities between time-limited incontestability and suicide exclusion clauses).

[30] Digitalchemy argues we should import a definition for "date of issue" from RCW 48.76.050, which governs calculation of adjusted premiums. But that statute expressly restricts its use only "for the purpose of this section." RCW 48.76.050(1)(d). Digitalchemy also argues RCW 48.23.060 and RCW 48.18.480 will be violated by adopting John Hancock's understanding of "date of issue." RCW 48.23.060 allows changes in the premium amounts payable upon discovery "that the age of the insured . . . has been misstated." But this statute is inapplicable where, as here, an insured negotiates a specific issue age with the insurer and there is no showing of fraud, mutual mistake, or something similar. RCW 48.18.480 prohibits "any unfair discrimination between insureds" with similar risk factors "in the terms or conditions of any insurance contract." This statute is not violated because applying John Hancock's understanding requires that all insureds be unable to receive benefits if death occurs as a result of suicide before the passage of two calendar years from the policy's issue date, regardless of any backdating.

10

related statutes. John Hancock's understanding and use of "date of issue" aligns with the plain language of RCW 48.23.260(1)(b). Thus, the trial court did not err by concluding Digitalchemy failed to state a claim for violation of the statute.

III. Reformation

Contract reformation is "an equitable remedy employed to bring a writing that is materially at variance with the parties' agreement into conformity with that agreement."[31] Reformation may be appropriate where the parties made a mutual mistake.[32] A mutual mistake occurs when the parties share an identical intent when forming the contract but fail to express that shared intent in the document.[33] Although a party arguing for reformation must show "clear, cogent, and convincing evidence" to prove the parties' identical intentions,[34] on appeal from a CR 12(b)(6) dismissal, we accept the factual allegations in Digitalchemy's complaint as true.[35]

Digitalchemy alleges that it and John Hancock, acting through its insurance agent, agreed to backdate "the policy" to September 1, 2014.[36] Digitalchemy also alleges John Hancock recorded the policy's issue date as September 1, 2014 in its

---

[31] Denaxas v. Sandstone Court of Bellevue, L.L.C., 148 Wn.2d 654, 669, 63 P.3d 125 (2003).

[32] Id.

[33] Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co., 139 Wn.2d 824, 832, 991 P.2d 1126 (2000) (quoting Halbert v. Forney, 88 Wn. App. 669, 674, 945 P.2d 1137 (1997)).

[34] Denaxas, 148 Wn.2d at 669.

[35] Trujillo, 183 Wn.2d at 827 n.1.

[36] CP at 21.

internal computer systems "just as was agreed and endorsed on the policy."[37] And it alleges the policy "does not reflect an issue date of September 1, 2014, [and] the policy fails to accurately reflect the agreement of the parties."[38]

Taken as true and considered together, Digitalchemy alleged the parties mutually intended to change both the policy date and issue date to September 1, 2014, and the face of the policy does not reflect the parties' intentions. Because we must accept Digitalchemy's factual allegations as true,[39] Digitalchemy alleged a viable reformation claim. Thus, the court erred by dismissing this claim under CR 12(b)(6).

## IV. CPA and IFCA Claims

Digitalchemy alleges John Hancock violated the CPA by failing to refund its premium payments after terminating Koffron's life insurance policy. Digitalchemy bases its IFCA claim upon that violation.

To prevail on a CPA claim, a party must establish "(1) an unfair or deceptive act or practice, (2) that act or practice occurs in trade or commerce, (3) a public interest impact, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act and the injury."[40] A theory that an

---

[37] CP at 22.

[38] CP at 24.

[39] See Swanson, 118 Wn.2d at 524 ("[T]he matter of the parties' intent . . . is a question of fact which we do not decide."); Trujillo, 183 Wn.2d at 830 (courts accept as true all facts alleged in complaint on a motion to dismiss).

[40] Folweiler Chiropractic, PS v. Am. Family Ins. Co., 5 Wn. App. 2d 829, 836, 429 P.3d 813 (2018), review denied sub nom. Folweiler Chiropractic, PS v. Am. Family Ins., 193 Wn.2d 1001, 443 P.3d 800 (2019).

insured violated insurance regulations may adequately allege the first three elements of a CPA claim.[41]

First, Digitalchemy argues John Hancock's conduct violated RCW 48.30.090 and WAC 284-30-330(1). Both prohibit misrepresentation of insurance policy provisions. The statute also prohibits "any misrepresentation of . . . the benefits or advantages promised . . ." in the policy.[42]

In the suicide exclusion provision of the life insurance policy, John Hancock states, "[W]e will pay (in place of all other benefits, if any) an amount equal to the premiums paid" if the policy terminates as a result of the insured's suicide.[43] The policy also states John Hancock "will refund any amount of premium received that applies beyond the Policy Month in which the policy terminates" if the policy terminates on a date other than a premium due date.[44]

John Hancock argues it refunded the premiums because it did not dispute the amount of premiums owed, it sent a check for that amount, and the "check was negotiable and did not contain any conditions or restrictions."[45] Digitalchemy's allegations contradict this contention. The check accompanied a letter stating that

---

[41] See Panag v. Farmers Ins. Co. of Washington, 166 Wn.2d 27, 43, 204 P.3d 885 (2009) (violating insurance statutes or regulations satisfies the public interest element of a CPA claim) (citing RCW 48.01.010(1), .030, .040); Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 785-86, 719 P.2d 531 (1986) (first two elements of a CPA claim can be established by state law violations).

[42] RCW 48.30.090.

[43] CP at 87 (emphasis added).

[44] CP at 84 (emphasis added).

[45] Resp't's Br. at 33.

negotiating the check meant Digitalchemy agreed to the terms of a release and indemnification agreement.

John Hancock made an unconditional promise to repay all premiums following termination of the policy due to suicide. After termination, it conditioned repayment on Digitalchemy signing a release and indemnification. Because this conduct misrepresented the terms and benefits of its policy, Digitalchemy adequately alleged violations of RCW 48.30.090 and WAC 284-30-330(1) for purposes of CR 12(b)(6).

Second, Digitalchemy also alleges John Hancock violated WAC 284-30-350(5), which prohibits an insurer from "request[ing] a first party claimant [ ] sign a release that extends beyond the subject matter that gave rise to the claim payment." Koffron's death and Digitalchemy's claim gave rise to the payment.[46]

John Hancock's letter accompanying the check warned Digitalchemy, "Should you decline to accept the denial of proceeds on this policy on a voluntary basis, John Hancock stands ready to pursue any and all of its legal rights."[47] The indemnification agreement releases John Hancock from all of Digitalchemy's claims and requires that Digitalchemy defend it against any future liability relating to the policy filed by any party.[48] Digitalchemy did not deposit the check or sign

---

[46] Neither party addresses whether repayment of premiums constitutes a "claim payment" under this regulation, and we assume, without deciding, it does.

[47] CP at 124.

[48] CP at 23, 125. The release agreement states that Digitalchemy will "hereby release and forever discharge John Hancock, and its past, present and future affiliates, parent, sister, brother or subsidiary corporations, officers, directors, shareholders, employees, agents, general agents, independent contractors, representatives, attorneys, administrators, successors and assigns

14

the agreement. Four months later, John Hancock sent another letter asking Digitalchemy to "[k]indly execute the [ ] release and return by October 30, 2017 to avoid becoming a defendant in litigation. Please be advised that your failure to comply with our request will result in [John Hancock] taking legal action."[49]

John Hancock demanded a release indemnifying it, its employees, its agents, and many others against any future claim from anyone for any amount of liability relating to the policy. This sweeping release would, hypothetically, prohibit Digitalchemy from filing a claim against the insurance agent who sold them Koffron's policy even if they later discovered improper conduct in the sale of the policy. These potential claims are beyond the scope of Koffron's death and Digitalchemy's claim, particularly where both insurer and insured agree about the amounts owed. Allegations that John Hancock demanded a sweeping release and indemnification agreement beyond the scope of Koffron's death and Digitalchemy's claim, such allegations adequately state a claim for a violation of WAC 284-30-350(5) for purposes of CR 12(b)(6).

John Hancock's alleged violations of RCW 48.30.090, WAC 284-30-330(1), and WAC 284-30-350(5) adequately state the first three elements of a CPA

---

from any and all claims, demands, obligations, liabilities, or causes of action whatsoever, whether known or unknown, foreseen or unforeseen on, account of, arising out of or relating to Policy Number 81-016-655 and will defend, indemnify, and hold harmless John Hancock against any loss or liability on account of any claim, demand, obligation, liability, or cause of action." CP at 125 (emphasis added).

[49] CP at 285.

claim.[50] To state a valid claim here, Digitalchemy must also have alleged facts showing an injury and a causal link between the per se violations and its injury. An insured can satisfy the elements of injury and causation by alleging that its property interests or money have been diminished or delayed as a result of the insurer's unlawful conduct.[51] Digitalchemy had the unqualified contractual right to repayment of the premiums it paid to John Hancock. Arguably, it has been unable to take possession of those funds as a direct result of these per se CPA violations. Digitalchemy alleged facts sufficient to state a valid CPA claim for purposes of CR 12(b)(6).

An insured may have a valid claim under IFCA where it successfully alleges the insurer "unreasonably denied a claim for . . . payment of benefits."[52] Because Digitalchemy adequately alleged John Hancock misstated or ignored its contractual obligation to repay all premiums, the court erred by dismissing its IFCA claims under CR 12(b)(6).[53]

V. Attorney Fees on Appeal

Digitalchemy requests attorney fees on appeal under RAP 18.1 and argues they are authorized under Olympic Steamship, the CPA, and IFCA. RAP 18.1 authorizes attorney fees and costs to the prevailing party on appeal if applicable

---

[50] Panag, 166 Wn.2d at 43; Hangman Ridge, 105 Wn.2d at 785-86.

[51] Trujillo, 183 Wn.2d at 837 (citing Panag, 166 Wn.2d at 57); Folweiler, 5 Wn. App. 2d at 839.

[52] RCW 48.30.015(1).

[53] Digitalchemy alleges three other bases for a CPA claim, but none state a valid claim.

law grants a party the right to recover and that party requests fees and costs in its opening brief.[54] "'[A] plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."[55] Digitalchemy's partial success on appeal does not provide "actual relief" because the claims that survived CR 12(b)(6) are far from resolved. Because Digitalchemy has not yet prevailed at this stage of the litigation, an award of attorney fees and costs is premature. If Digitalchemy ultimately prevails on any of its claims on remand and the trial court concludes fees and costs are appropriate, the trial court may award fees and costs for this appeal.[56]

Therefore, we affirm in part, reverse in part, and remand for further proceedings.

WE CONCUR:

---

[54] RAP 18.1(a)-(b).

[55] Parmelee v. O'Neel, 168 Wn.2d 515, 522, 229 P.3d 723 (2010) (quoting Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)).

[56] See RAP 18.1(i) (trial courts may be determine amounts of appellate attorney fees on remand).